# INTERSTATE COMMERCE COMMISSION v. CHICAGO GREAT WESTERN RAILWAY COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 73.   Argued April 16, 17, 1907.—Decided March 23, 1908.

Railroads are the private property of their owners, and while the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, the public is in no proper sense a general manager. The companies may, subject to change of rates provided for in the Interstate Commerce Act, contract with shippers for single and successive transportations and in fixing their own rates may take into account competition, provided it is genuine and not a mere pretense.

There is no presumption of wrong arising from a change of rate made by a carrier. The presumption of good faith and integrity attends the action of carriers as it does the action of other corporations and individuals and those presumptions have not been overthrown by any legislation in respect to carriers.

A rate on the manufactured article resulting from genuine competition and natural conditions is not necessarily an undue and unreasonable discrimination against a manufacturing community because it is lower than the rate on the raw material; and, under the circumstances of this case, there was no undue and unreasonable discrimination against the Chicago packing-house industries on the part of the railroads in making, as the result of actual competition and conditions, a lower rate for manufactured packing-house products than for livestock from Missouri River points to Chicago.

141 Fed. Rep. 1003, affirmed.

CERTAIN proceedings were had before the Interstate Commerce Commission. They were commenced by the filing of a petition by the Chicago Live Stock Exchange in April, 1902, charging the defendants, who are now the appellees, with the violation of §§ 1 and 3 of the Interstate Commerce Act of February 4, 1887. The specific offense stated was that the defendants were charging higher rates of freight upon live stock shipped from Missouri River points, and other points

similarly situated, to Chicago, than upon dressed meats and the prepared products known as packing-house products. It was contended that this higher rate of freight was an unlawful discrimination against shippers of live stock to Chicago, and gave to shippers of packing-house products an undue and unreasonable preference and advantage over the former; that it subjected the Chicago Live Stock Exchange and its members, who were engaged in the business of selling live stock on commission, as well as the owners of live stock and the shippers thereof, to an unreasonable prejudice and disadvantage. The several defendants, with one or two exceptions, answered, denying the allegations of the complaint. After a hearing, the Interstate Commerce Commission, on January 7, 1905, filed its report and opinion, including findings of fact, and made an order, which is the foundation of this suit. The order is in these words:

"Order of Commission.

"This case being at issue upon complaint and answers on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the Commission having, on the date hereof, made and filed a report and opinion containing its findings of fact and conclusions thereon, which said report and opinion is hereby referred to and made a part of this order:

"It is ordered, that, in accordance with said report and opinion, the present relation of rates maintained and enforced by defendants [naming them all, eighteen in number], whereby their rates for transportation are higher upon live cattle and live hogs than upon the dressed or prepared products of cattle and hogs on shipments thereof to Chicago, in the State of Illinois, from points on the Missouri River, Sioux City, in the State of Iowa, to Kansas City, in the State of Missouri, inclusive, and from South St. Paul, in the State of Minnesota, or from points in the territory between the Missouri River or South St. Paul and Chicago, constitutes wrongful prejudice

and discrimination, in violation of the provisions of the act to regulate commerce; and that said defendants be, and each of them is hereby, notified and required to cease and desist, on or before the fifteenth day of February, 1905, from maintaining or enforcing the said unlawful relation of rates, and from further continuing said unlawful prejudice and discrimination.

"And it is further ordered, that a notice embodying this order be forthwith sent to each of the defendant corporations, together with a copy of the report and opinion of the Commission herein, in conformity with the provisions of section 15 of the act to regulate commerce."

The defendants not complying with this order, the Interstate Commerce Commission caused this suit to be commenced in the Circuit Court of the United States for the Northern District of Illinois, seeking to compel compliance. The defendants answered, admitting service of the order and refusal to comply therewith, denying that it was legal or binding, but on the contrary claiming that it was in violation of their rights. After the filing of the petition to enforce the order of the Commission and the answers thereto, and in August, 1905, the Commission also commenced an original proceeding under and by virtue of the act of February 19, 1903 (32 Stat. 847), known as the Elkins Act, charging substantially the same discrimination. These cases were consolidated and heard before the Circuit Court, an enormous volume of additional testimony being taken, and on November 20, 1905, that court announced its opinion, stated its findings of fact and conclusions of law, and ordered that the bill should be dismissed. A decree accordingly was so entered. 141 Fed. Rep. 1003. The findings of fact were as follows:

"First. That the live stock rates are reasonable in themselves. All live stock from points west, southwest and northwest of the Missouri River and St. Paul are shipped on a proportional rate from the Missouri River or St. Paul to Chicago. These rates are equal to or less than the rates on dressed meats

and packing-house products between the same points. There can be, and is, no complaint as to such traffic. The local rates from the Missouri River and St. Paul, and from 150 miles east, to Chicago, are as shown in above schedule. These rates gradually decrease until the Mississippi River is reached, and the average Iowa rate is 21 cents. The great weight of evidence indicates that these rates are at least reasonably low.

"Second. That the cost of carrying live stock is greater than that of carrying dressed meats and packing-house products.

"Third. That the value of the service of carriage is greater to the packers, because of the higher price of a car of dressed meats or packing-house products. Dressed meats and packing-house products are in value worth nearly twice as much as live stock. This factor is important, in ordinary cases, however, in part, because of the greater risk of carriage of high-priced commodities. In these cases, as to the particular commodities in question, the evidence shows that the defendant railroad companies pay out a much larger amount in damages for losses arising from the carriage of live stock than they do for losses arising from the carriage of dressed meats and packing-house products, in proportion to the value of the products carried, and more in damages per car regardless of the value. This makes the risk of carriage greater for live stock. The result is that the value of the service is not such an important factor in this kind of a case as it is considered to be in ordinary cases.

"Fourth. That the rates in question given to the packers at Missouri River and St. Paul were the result of competition. The product of the packers at these points was large in quantity, was certain and continuous in amount, was in the hands of a few people, and for years before the Federal injunction of March, 1902, had been competed for so strenuously by the railroads reaching and passing through these points, as to cause the cutting of rates and the giving of secret rebates in large amounts. Four of the defendant companies, the Chicago,

Milwaukee & St. Paul Railroad Company, the Chicago & Northwestern Railway Company, the Chicago, Rock Island & Pacific Railway Company, and the Chicago, Burlington & Quincy Railroad Company, passed through these points into the territory west of the Missouri River and St. Paul. Four other of the defendant companies, the Chicago Great Western Railway Company, the Chicago & Alton Railway Company, the Illinois Central Railroad Company, and the Wabash Railroad Company reached the Missouri River points and St. Paul, competing for this business. Other railroads, running south to the Gulf of Mexico, also competed more or less for said business, including the Atchison, Topeka & Santa Fé Railway. After said injunction was granted the defendant railroads (according to evidence herein) obeyed it, and until August of that year the said traffic was carried under competition between the defendants at the rate of 23½ cents from Missouri River points to Chicago, and 25 cents from St. Paul to Chicago, etc., as set out above. As a result of such competition, the Chicago Great Western Railway Company became dissatisfied with the proportion of the business it received, and, in order to get what it claimed as its share, cut the rate to 20 cents to Chicago and 18½ cents to the Indiana line for eastern business, and published the same. This it did under a contract with the packers running for seven years. The Chicago Great Western Railway Company was the longest route from Chicago to the Missouri River points. The other railroad defendants, to meet the rate made by the Chicago Great Western Railway Company, as a result of competition, met and published the same rate. These rates were not made voluntarily, but from necessity arising from competition; the necessity being that of carrying the goods at the lower rate or losing the business to which the officers of said companies thought they were entitled. This cutting of the rate by the Chicago Great Western Railway Company was not the origin of competition. That had existed legally since March, 1902, between defendant railroads and also between them and the Atchison, Topeka & Santa Fé

Railway Company. There was not competition enough at said points to lower the rate as to live stock. There was little and different competition on rates as to live stock at points between the Missouri River and St. Paul and Chicago. The only places where the opportunities for competition existed as to live stock the same as to packing-house products were immediately at Missouri River points and St. Paul, and there only as to live stock driven in on foot from the surrounding country. There is comparatively a small amount of this stock. If it was exactly the same kind of a commodity as that furnished by the packers there would be an opportunity for competition in this at these points alone.

"Fifth. That the competition in question did not result from agreement of the defendants, but was actual, genuine competition.

"Sixth. That the present rates on live stock have not materially affected any of the markets, prices, or shipments; that they are reasonably fair to Chicago and to the shippers; that the shipments of live stock from points between Chicago and the Missouri River and St. Paul are as great in proportion to the volume of business as before the present rates were made; that the majority of the live stock comes to Chicago from points as near as 150 miles this side of the Missouri River and St. Paul, and that the lower rate given to the packers does not seem to directly influence or injure the shippers of live stock.

"Seventh. That the rates for carrying packers' products and dressed meats were remunerative. They did not pay any portion of the fixed charges and interest of the railroad companies, nor its full share of the operating expenses, but they did pay more than its cost of movement and leave something to apply upon operating expenses.

"Eighth. That the welfare of the public, including the shippers, consumers, and all localities and markets, does not seem to be materially affected by the present rates.

"Ninth. That the usual custom for railroads is to charge a higher rate for the finished product than for the raw ma-

terial, and this, as a rule, has been applied to live stock and its finished products. This is not universal, however. There are many commodities where the raw material is charged more for carriage than its finished product, as in the case of the raw material of cotton and compressed cotton, straw, unbaled and baled, pig iron and its products, and many other commodities. It also appears that for sixteen years out of twenty-three, between Missouri River points and St. Paul and Chicago, the published rates on live stock were higher than on dressed meats and packing-house products. Many witnesses testified that the ideal rate for the finished product would be higher than the raw material. This, however, was based on the presumption that competition or commercial necessity did not interfere, and that the cost of service and value of the products would be greater in case of the finished products than in that of the raw material."

Section 3 of the Interstate Commerce Act, 24 Stat. 380, so far as it is material for this case, is as follows:

"It shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

And § 3 of the Elkins Act, 32 Stat. 847, provides:

"That whenever the Interstate Commerce Commission shall have reasonable ground for believing that any common carrier . . . is committing any discriminations forbidden by law, a petition may be presented alleging such facts " (such discrimination), " to the Circuit Court of the United States sitting in equity having jurisdiction . . . and upon being satisfied of the truth of the allegations of said petition said court shall . . . require a discontinuance of such discrimination by proper orders, writs," etc.

*Mr. L. A. Shaver* and *Mr. S. H. Cowan* for appellant:

A higher rate on live stock than on its products is contrary to the natural rule or law that the raw-material rate shall not be higher than that on the manufactured article.

A departure from that rule is contrary to public policy, because it involves the destruction of large public interests which have been built up under the rule.

The making of the live-stock rate higher than the product rate is contrary to the almost universal practice of carriers throughout the country under which the rate on live stock is made no higher, but in many instances less, than the rate on the prepared product.

The higher rate on the live stock than on the product is violative of the rule that, other things being equal, value should control or be taken into account in rate making—the article of higher value taking a higher rate than one of lower value.

The changed relation is unlawful because it was made for an unlawful purpose, namely, the building up of the Missouri River markets at the expense of the Chicago markets, and its natural tendency is to that end.

The changed relation is unlawful because it was initiated by the Chicago Great Western Railway Company solely with a view of promoting its own interest and without regard to the public interest involved.

The changed relation is unlawful because there was no legitimate competition in rates necessitating it—the only prior competition being in the shape of rebates.

The contract of the Chicago Great Western Railway Company with the Missouri River packers is unlawful under the so-called "anti-trust" act because it gives that company a "monopoly of a part of the trade or commerce among the several States," and, also, because it is "a contract in restraint of trade and commerce among the several States."

The contract is unlawful because it was for the reduction of a rate on the product claimed to be already unreasonably

low and which, that being the case, as reduced, places a burden upon other traffic.

The contract is unlawful because it gives an undue preference to one article of traffic (the product) over another article of traffic (live stock), both articles being in active competition with each other in the markets.

*Mr. Cordenio A. Severance*, with whom *Mr. Frank B. Kellogg* and *Mr. Robert E. Olds* were on the brief, for appellee, Chicago Great Western Railway Company:

Findings of fact by the Circuit Court should be accepted on appeal as witnesses testified in open court. *Halsell* v. *Renfrow*, 202 U. S. 291; *Shappirio* v. *Goldberg*, 192 U. S. 240; *Beyer* v. *Le Fevre*, 186 U. S. 119; *Stuart* v. *Hayden*, 169 U. S. 14; *Warren* v. *Keep*, 155 U. S. 267; *Crawford* v. *Neal*, 144 U. S. 596; *Evans* v. *Bank*, 141 U. S. 107.

The contract between respondent Chicago Great Western Railway Company and various packers was proper exercise of its right to compete for business. *Cotting* v. *Godard*, 183 U. S. 79; *Hopkins* v. *United States*, 171 U. S. 600; *Delaware, Lackawanna & Western Ry. Co.* v. *Kutter*, 147 Fed. Rep. 51; *Interstate Comm. Comm.* v. *B. & O. Ry. Co.*, 43 Fed. Rep. 37; *Whitwell* v. *Continental Tobacco Co.*, 125 Fed. Rep. 454.

The rate on live-stock products brought about by the Chicago Great Western contract did not involve an undue preference or unjust discrimination within the meaning of the Interstate Commerce law. *Interstate Comm. Comm.* v. *B. & O. Ry. Co.*, 145 U. S. 276; *East Tenn., V. & G. Ry. Co.* v. *Interstate Comm. Comm.*, 181 U. S. 1; *Texas & Pacific Ry. Co.* v. *Interstate Comm. Comm.*, 162 U. S. 197; *Interstate Comm. Comm.* v. *Alabama Midland Ry. Co.*, 168 U. S. 144; *Louisville & Nashville Ry. Co.* v. *Behlmer*, 175 U. S. 648; *Interstate Comm. Comm.* v. *Louisville & Nashville Ry. Co.*, 190 U. S. 273; *D., L. & W. Ry. Co.* v. *Kutter*, 147 Fed. Rep. 51; *Interstate Comm. Comn.* v. *B. & O. Ry. Co.*, 43 Fed. Rep. 37; *Platt* v. *Le Cocq*, 150 Fed. Rep. 391; *Interstate Comm. Comm.* v. *Western & Atlantic*

*Ry. Co.*, 93 Fed. Rep. 83; Judson on Interstate Commerce, §§ 175–183.

Neither the Commission nor the court had the right to ignore the relative cost of the service in determining whether the apparent discrimination was undue or unreasonable. *Squire* v. *Michigan Central Ry. Co.*, 3 I. C. C. R. 521.

The Commission, previous to the amendment of the law in 1906, had no power to fix rates, and hence no power to establish the relation between rates. *Cincinnati, N. O. & Tex. Pac. Ry. Co.* v. *Interstate Comm. Comm.*, 162 U. S. 184; *Interstate Comm. Comm.* v. *C., N. O. & Tex. Pac. Ry. Co.*, 167 U. S. 479; *Interstate Comm. Comm.* v. *Alabama Midland Ry. Co.*, 168 U. S. 145; *Southern Pacific Co.* v. *Colorado Fuel & Iron Co.*, 101 Fed. Rep. 779.

Findings of fact of the lower court, from which the conclusion necessarily followed that respondents have a decree in their favor, was abundantly supported by the testimony and the law.

*Mr. Ed. Baxter* for appellees as of record. *Mr. Charles A. Clark* for intervenor, T. M. Sinclair & Company, Limited. *Mr. Frank T. Ransom* for intervenor, Union Stock Yards Company of Omaha, Limited. *Mr. Stephen S. Brown* and *Mr. John E. Dolman* filed a brief on behalf of intervenor, St. Joseph Stock Yards Company of St. Joseph, Missouri. *Mr. S. A. Lynde* filed a brief on behalf of appellee, The Chicago & Northwestern Railway Company.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

It is unnecessary to define the full scope and meaning of the prohibition found in § 3 of the Interstate Commerce Act—or even to determine whether the language is sufficiently definite to make the duties cast on the Interstate Commerce Commission ministerial, and therefore such as may legally be imposed

upon a ministerial body, or legislative, and therefore, under the Federal Constitution, a matter for Congressional action— for within any fair construction of the terms "undue or unreasonable" the findings of the Circuit Court place the action of the railroads outside the reach of condemnation.

The complainant, before the Interstate Commerce action, was an incorporated association. The purposes for which it was organized were, as stated in its charter, "to establish and maintain a commercial exchange; to promote uniformity in the customs and usages of merchants; to provide for the speedy adjustment of all business disputes between its members; to facilitate the receiving and distributing of live stock, as well as to provide for and maintain a rigid inspection thereof, thereby guarding against the sale or use of unsound or unhealthy meats; and generally to secure to its members the benefits of coöperation in the furtherance of their legitimate pursuits." Its members were, as found by the Commerce Commission, "engaged in the purchase, shipment and sale of live stock for themselves and upon commission." It was such an association, with members engaged in the business named, that initiated these proceedings and in whose behalf they were primarily prosecuted. While it may be that the proceedings are not to be narrowly limited to an inquiry whether this particular complainant has been in any way injured by the action of the railroad companies, yet that question must be regarded as the one which was the special object of inquiry and consideration. It is true that the Commission subsequently commenced under the Elkins Act an independent suit in its own name, but it was practically to enforce the award made by the Commission after its inquiry into the controversy between the live stock exchange and the railroad companies.

It must be remembered that railroads are the private property of their owners; that while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no

proper sense is the public a general manager. As said in *Int. Com. Com.* v. *Ala. Mid. R. R. Co.*, 168 U. S. 144, 172, quoting from the opinion of Circuit Judge Jackson, afterwards Mr. Justice Jackson of this court, in *Int. Com. Com.* v. *B. & O. R. R. Co.*, 43 Fed. Rep. 37, 50:

"Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and of their own situation and relation to it, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits."

It follows that railroad companies may contract with shippers for a single transportation or for successive transportations, subject though it may be to a change of rates in the manner provided in the Interstate Commerce Act—*Armour Packing Co.* v. *The United States, ante,* p. 56, and also that in fixing their own rates they may take into account competition with other carriers, provided only that the competition is genuine and not a pretense. *Int. Com. Com.* v. *B. & O. R. R. Co.*, 145 U. S. 263; *T. & P. Ry. Co.* v. *Int. Com. Com.*, 162 U. S. 197; *Int. Com. Com.* v. *Ala. Mid. Ry. Co., supra; L. & N. R. R. Co.* v. *Behlmer*, 175 U. S. 648; *East Tenn. &c. Ry. Co.* v. *Int. Com. Com.*, 181 U. S. 1; *Int. Com. Com.* v. *L. & N. R. R. Co.*, 190 U. S. 273.

It must also be remembered that there is no presumption of wrong arising from a change of rate by a carrier. The presumption of honest intent and right conduct attends the action of carriers as well as it does the action of other corporations or individuals in their transactions in life. Undoubtedly when rates are changed the carrier making the change must,

when properly called upon, be able to give a good reason there-
for, but the mere fact that a rate has been raised carries with
it no presumption that it was not rightfully done. Those
presumptions of good faith and integrity which have been
recognized for ages as attending human action have not been
overthrown by any legislation in respect to common carriers.

The Commerce Commission did not find whether the rates
were reasonable or unreasonable *per se.* Its omission may
have been owing, partly at least, to the decision in *Interstate
Commerce Commission* v. *C., N. O. & T. P. Ry. Company,* 167
U. S. 506, for this controversy arose before the amendment
of June 29, 1906. 34 Stat. 584. On the other hand, the Cir-
cuit Court found specifically that the live-stock rates were
reasonable, and also that the rates for carrying packers'
products and dressed meats were remunerative. See Findings
1 and 7; Obviously shippers had in the rates considered
separately no ground of challenge. But the burden of com-
plaint is not that any rates taken by themselves were too high,
but that the difference between those on live stock and those
on dressed meats and packers' products worked an unjust dis-
crimination.

It is insisted that "the making of the live-stock rate higher
than the product rate is violative of the almost universal rule
that the rates on raw material shall not be higher than on the
manufactured product." This may be conceded, but that the
rule is not universal the proposition itself recognizes, and the
findings of the court give satisfactory reasons for the exception
here shown. See Findings 2, 3 and 9. The cost of carriage,
the risk of injury, the larger amount which the companies are
called upon to pay out in damages make sufficient explanation.
They do away with the idea that in the relation established
between the two kinds of charges any undue or unreasonable
preference was intended or secured.

Finding No. 6 is very persuasive. It reads:

"Sixth. That the present rates on live stock have not ma-
terially affected any of the markets, prices, or shipments;

that they are reasonably fair to Chicago and to the shippers; that the shipments of live stock from points between Chicago and the Missouri River and St. Paul are as great in proportion to the volume of business as before the present rates were made; that the majority of the live stock comes to Chicago from points as near as 150 miles this side of the Missouri River and St. Paul, and that the lower rate given to the packers does not seem to directly influence or injure the shippers of live stock."

If the rates complained of have not materially affected any of the markets, prices, or shipments; if they are reasonably fair to Chicago and the shippers; if the shipments of live stock from the west to Chicago are as great in proportion to the bulk of the business as before the present rates were made, and the lower rate given to the packers does not directly influence or injure the shippers of live stock; it is difficult to see what foundation there can be for the claim of an undue and unreasonable preference. It would seem a fair inference from the findings that the real complaint was that the railroad companies did not so fix their rates as to help the Chicago packing industry; that they recognized the fact that along the Missouri River had been put up large packing-houses, and, without any intent to injure Chicago, had fixed reasonable rates for the carrying of live stock to such packing-houses and also to Chicago; that those packing-houses being nearer to the cattle fields were able to engage in the packing industry as conveniently and successfully as the packing-houses in Chicago. If we were at liberty to consider the mere question of sentiment, certainly to place packing-houses close to the cattle fields, thus avoiding the necessity of long transportation of the living animals—a transportation which cannot be accomplished without more or less suffering to them—and to induce transportation to those nearer packing-houses would deserve to be commended rather than condemned.

With reference to competition we have referred to the cases in this court in which that matter has been considered. Ac-

cording to the fourth finding the rates in question given to the packers at the Missouri River and St. Paul were the result of competition. Without recapitulating all the facts disclosed in that finding it is enough to say that the Chicago Great Western Railway Company, which had the longest line from Chicago to Missouri River points, made a reduction in the rates, and did this, as its president testified, "for the purpose of securing a greater proportion of the traffic in the products of live stock than it had been previously able to obtain." That is one of the facts inducing competition, and one of the results expected to flow from a reduction of rates. It certainly of itself deserves no condemnation. In order to secure to themselves what was likely to be transferred to the Great Western by virtue of its reduction of rates, the other companies also made a reduction and, as shown by the fifth finding, the competition was not the result of agreement, but was an "actual, genuine, competition." It may be true, as contended by counsel for the appellant, that even a genuine competition which results in a change of rates does not necessarily determine the question whether the rates as fixed work an undue preference or create an unlawful discrimination. Those rates fixed may make a preference or discrimination irrespective of the motives which caused the railway companies to adopt them, and yet the fact of a genuine competition does make against the contention that the rates were intended to work injustice. An honest and fair motive was the cause of the change in rates; honest and fair on the part of the Great Western in its effort to secure more business, and equally honest and fair on the part of the other railway companies in the effort to retain as much of the business as was possible. In other words, this competition eliminates from the case an intent to do an unlawful act, and leaves for consideration only the question whether the rates as established do work an undue preference or discrimination; and as the findings of the court show that the result of the new rates has not been to change the volume of traffic going to Chicago, or materially affect the business

of the original complainant, it would seem necessarily to result that the charge of an unlawful discrimination is not proved. In short, there was no intent on the part of the railway companies to do a wrongful act, and the act itself did not work any substantial injury to the rights of the complainant.

We have not attempted to review in detail the great mass of testimony, amounting to two enormous printed volumes. It is enough to say that an examination of it clearly shows sufficient reasons for the findings of fact made by the Circuit Court.

In short, the findings of the Circuit Court were warranted by the testimony, and those findings make it clear that there was no unlawful discrimination.

The decree of the Circuit Court is

*Affirmed.*

Mr. Justice Moody did not hear the argument nor take part in the decision of this case.