EDITH H. JONES, Chief Judge,
with whom
REAVLEY, JERRY E. SMITH, and OWEN, Circuit Judges, join, concurring:
I concur in Judge Reavley’s opinion but write separately to address in more detail the “plain meaning” of the Packers and Stockyards Act of 1921. The words of the Act are, on their face, empty vessels, but this does not leave courts “free to pour a vintage that we think better suits present-day tastes.” United States v. Sisson, 399 U.S. 267, 297, 90 S.Ct. 2117, 2133, 26 L.Ed.2d 608 (1970). Rather, we have a duty to give those words meaning consistent with their statutory and common-law antecedents, which were known well by the Members of the Congress that passed the Act. The words we are asked to interpret were terms of art, and their meanings were fixed by judicial definition and consistent usage. To ignore this evidence would be to turn the plain meaning rule on its head. Read in the proper context, these provisions concern only those business dealings that have an actual or potential effect on competition.
As Judge Garza, writing in dissent, states, “Proper statutory analysis begins with the plain text of the statute.” “[I]n interpreting a statute a court should always turn first to one, cardinal canon before all the others .... [Cjourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, this first canon is also the last: ‘judicial inquiry is complete.’ ” Connecticut National Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted). That we look primarily to the text, rather than attempt to divine Congress’s inten *365 tions otherwise, is the law of this circuit. See, e.g., In re Rogers, 513 F.3d 212, 225-26 (5th Cir.2008) (citing Lamie v. United States Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004)).
When the words are ambiguous or vague, however, our inquiry cannot end there. In this case, the language of §§ 202(a) and (b) of the Packers and Stockyards Act of 1921 (codified at 7 U.S.C. § 192) resists any attempt to discern its plain meaning:
§ 192. Unlawful practices enumerated[1]
It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect ....
“Unfair,” “unjustly discriminatory,” “undue or unreasonable preference”: Read literally, they establish no standard at all.[2] (The Act’s bar on “deceptive practice^],” by contrast, is clearer.) Does this mean that each court and jury must determine, in its unique estimation, what is unfair, unjust, undue, or unreasonable? If so, the law — what is allowed, what prohibited— would essentially become a matter of fact. Any contract within the Act’s ambit would be subject to challenge as putatively “unfair.”
Even Judge Garza, who finds the words of §§ 202(a) and (b) to be unambiguous, rejects this result. Unfairness, he suggests, is a question for the trial court to be determined “in the context of industry standards, the economic justifications for the actions, and the motives and actions of those concerned.” Although not illogical, this gloss is also nowhere in the statute. It is in no way “plain” from the statutory text. Presumably, it does not encompass all contracts that are “unfair” or “unreasonable” because they confer some advantage on one party or another. Such a prohibition “would be violative of reason, because it would include all those contracts which are the very essence of trade.” United States v. Trans-Missouri Freight Association, 166 U.S. 290, 351, 17 S.Ct. 540, 563, 41 L.Ed. 1007 (1897) (White, J., dissenting). So by what objective criteria may these concepts be limited? As I explain below, Congress, by its use of legal terms that were well defined at the time, “certainly did not delegate any such free value-choosing role to the courts.” Robert Bork, The Antitrust Parauox 53 (1993).
It would be a mistake to assume that the plain meaning rule requires interpretation of the PSA in a linguistic vacuum, ignoring how its terms were used by Congress or *366 understood at the time of the Act’s passage. “Words that have acquired a specialized meaning in the legal context must be accorded their legal meaning.” Buckhannon Bd. and Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598, 615, 121 S.Ct. 1835, 1846, 149 L.Ed.2d 855 (2001). It is therefore a strong presumption that adoption of the wording of a statute “carries with it the previous judicial interpretations of the wording.” Carolene Products Co. v. United States, 323 U.S. 18, 26, 65 S.Ct. 1, 5, 89 L.Ed. 15 (1944). In such borrowing, Congress “presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.” Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952). More poetically, “if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it.” Moskal v. United States, 498 U.S. 103, 121, 111 S.Ct. 461, 472, 112 L.Ed.2d 449 (1990) (quoting Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947)). To be sure, this presumption is not inviolable. Its strength varies “with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted, and presence or lack of other indicia of intention.” Carolene Products, 323 U.S. at 26, 65 S.Ct. at 5.
The Interstate Commerce Act of 1887 (“ICA”) and the Federal Trade Commission Act of 1913 (“FTCA”) provided the template for what became the PSA. The language of the PSA is more than just similar to the language of these predecessors; it follows their contours precisely. Consider the first paragraph (of two) of § 3 of the ICA:
That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.
That pattern is repeated in § 202(b) of the PSA:
It shall be unlawful for any packer to ... (b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice of disadvantage in any respect whatsoever.
One concerned trains; the other, meat-packers. Otherwise, they are identical.
Similarly, § 202(a) of the PSA follows both the ICA and FTCA. That section prohibits “any unfair, unjustly discriminatory, or deceptive practice or device in commerce.” The term “unjustly discriminatory” can be traced to § 2 of the ICA, which defines and prohibits “unjust discrimination.” The entirety of the section, as well as the specific terms “unfair” and “deceptive,” are a slight variation on § 5 of the FTCA: “That unfair methods of competition in commerce are hereby declared unlawful.”
Not only is the language of the PSA nearly identical to that of its predecessors, but this choice of terms was deliberate. Their meaning had been firmly established in numerous court decisions that placed definite limits on the authority of, respec *367 tively, the Interstate Commerce Commission and Federal Trade Commission.
By 1921, the Supreme Court had spoken repeatedly on the ICA, FTCA, and other laws of Congress regulating competition— that is, the field of antitrust. The “character” of the terms borrowed for the PSA was, in the main, well-settled. Take “unfair,” the meaning of which had been the subject of the Court’s 1920 opinion in Federal Trade Commission v. Gratz:
The words “unfair method of competition” are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as a matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade ....
Nothing is alleged which would justify the conclusion that the public suffered injury or that competitors had reasonable ground for complaint. All question of monopoly or combination being out of the way, a private merchant, acting with entire good faith, may properly refuse to sell, except in conjunction, such closely associated articles as ties and bagging. If real competition is to continue, the right of the individual to exercise reasonable discretion in respect of his own business methods must be preserved.
Federal Trade Commission v. Gratz, 253 U.S. 421, 427-28, 40 S.Ct. 572, 575, 64 L.Ed. 993 (1920).[3] “Unfair” was not an inkblot in 1921. Congress could not have expected, then, that its use of the term would occasion a free-ranging inquiry into the equities of business practices; rather, Congress intended, and made plain by its choice of language, that injury to competition would be an element of the inquiry.
The meaning of “undue or unreasonable preference” and the associated terms and concepts from § 3 of the ICA was, if anything, even more definite. These, too, incorporated the concept of competitive injury. Surveying the Supreme Court’s cases, Justice Owen Roberts described its consistent application of the term from 1896 onwards:
The theory of the act is that the carriers in initiating rates may adjust them to competitive conditions, and that such action does not amount to undue discrimination; Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 [(1896)]. There the charging of rates on import traffic moving from a port on through bills of lading, much lower than those fixed for domestic transportation, was held not to amount as matter of law to discrimination forbidden by section 3. The carrier showed, in justification of the lower rates on import traffic, that, unless these were permitted, water and rail-and-water competition would divert the traffic away from the port of New Orleans and the carrier’s lines extending *368 from that port. Since that decision it has been recognized that export and import shipments, although not made on through bills, might lawfully be transported at rates below those charged for domestic traffic between the same points. Interstate Commerce Comm. v. Baltimore & Ohio R.R. Co., 145 U.S. 263, 276, 12 S.Ct. 844, 36 L.Ed. 699 [(1892)]; Interstate Commerce Comm. v. Alabama Midland Ry. Co., 168 U.S. 144, 164, 18 S.Ct. 45, 42 L.Ed. 414 [(1897)]; Louisville & N.R. Co. v. Behlmer, 175 U.S. 648, 671, 20 S.Ct. 209, 44 L.Ed. 309 [(1900)]; Inter-Mountain Rate Cases, 234 U.S. 476, 483-485, 34 S.Ct. 986, 58 L.Ed. 1408 [(1914)].
Texas & P. Ry. Co. v. United States, 289 U.S. 627, 636-37, 53 S.Ct. 768, 771-72, 77 L.Ed. 1410 (1933). This was not, however, an innovation of the ICA but longstanding practice under the laws of Great Britain on which the ICA, and by extension the PSA, was patterned:
In construing statutory provisions forbidding railway companies from giving any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatever, the English courts have held, after full consideration, that competition between rival lines is a fact to be considered, and that a preference or advantage thence arising is not necessarily undue or unreasonable.
Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U.S. 144, 164, 18 S.Ct. 45, 48, 42 L.Ed. 414 (1897) (citations omitted). From the earliest cases, then, the Court recognized that the ICA was “not designed to prevent competition between different [rail] roads” and that actions undertaken in furtherance of such competition were therefore not undue or unreasonable preferences.[4] Id. at 164-65, 18 S.Ct. at 48; see also Interstate Commerce Commission v. Chicago Great Western Ry. Co., 209 U.S. 108, 119, 28 S.Ct. 493, 495, 52 L.Ed. 705 (1908) (“in fixing their own rates, they [railroads] may take into account competition with other carriers, provided only that the competition is genuine, and not a pretense”).
As for “unjustly discriminatory,” used in § 202(a) of the PSA, it was also a term of art, borrowed from § 2 of the ICA. Any independent meaning that it bears, however, is somewhat obscured by the tendency *369 of courts to treat it as a creative variation on “undue and unreasonable preference,” thus reading §§ 2 and 3 of the ICA as one. But there were exceptions. In Chicago Great Western Ry. Co., the court considered the term apart from the language of § 3. The railway had, in seeming contravention of the statutory text, charged higher rates for the shipment of livestock than for dressed meats and prepared products (known as “packing-house products”). The ICC determined this to be a violation of both §§ 2 and 3. The Supreme Court rejected that result, holding that the railway’s honest competitive motive precluded a finding of unjust discrimination:
An honest and fair motive was the cause of the change in rates, honest and fair on the part of the Great Western in its effort to secure more business, and equally honest and fair on the part of the other railway companies in the effort to retain as much of the business as was possible. In other words, this competition eliminates from the case an intent to do an unlawful act, and leaves for consideration only the question whether the rates as established do work an undue preference or discrimination ....
Chicago Great Western Ry. Co., 209 U.S. at 122, 28 S.Ct. at 498. As further evidence that “unjust discrimination” is that which injures competition, the court held that, against the backdrop of a carrier’s near-absolute right to reduce rates, the ICC was empowered to prevent “excessively low,” or predatory, rates through its power to prevent unjust discrimination under § 2. Skinner & Eddy Corp. v. United States, 249 U.S. 557, 566, 39 S.Ct. 375, 378, 63 L.Ed. 772 (1919); id. at 567-68, 39 S.Ct. at 379 (§ 2 weighs against a proffered reading of the ICA that “would rather ensure monopoly than preserve competition”).
Thus, it is apparent not only that the terms of art employed §§ 202(a) and (b) of the PSA were clearly defined in jurisprudence, but also that none could be read as prohibiting legitimate competitive activity.
Congress knew that. The report of the House Committee on Agriculture which accompanied the PSA demonstrates Congress’s reliance on decisions construing the ICA and FTCA. Of the eight pages of the report concerning the PSA’s meatpacker provisions, six-and-a-half consist of a detailed exposition of Supreme Court decisions on the meaning and constitutionality of these earlier acts. H.R. Rep. No. 67-77, at 2-10 (1921). The decisions cited include: Interstate Commerce Commission v. Louisville & N.R. Co., 227 U.S. 88, 91, 33 S.Ct. 185, 187, 57 L.Ed. 431 (1913) (administrative decisions are reviewable by the courts and whether rates are unreasonable is “a matter of law”); Southern Pac. Co. v. Interstate Commerce Commission, 219 U.S. 433, 449-50, 31 S.Ct. 288, 293, 55 L.Ed. 283 (1911) (a rate change is not “unreasonable” merely because it may damage the interests of a rail customer); Federal Trade Commission v. Gratz, 253 U.S. 421, 428, 40 S.Ct. 572, 575, 64 L.Ed. 993 (1920) (no “unfair method of competition” under the FTCA when firm engaged in tying but it was not “alleged that they held a monopoly ... or had ability, purpose or intent to acquire one”); Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 46, 32 S.Ct. 22, 24, 56 L.Ed. 83 (1911) (despite the “permissive” phrasing of the prohibition on “any undue or unreasonable preference or advantage,” the ICA “does not attempt to equalize fortune, opportunities, or abilities”); Skinner & Eddy Corp. v. United States, 249 U.S. 557, 565-66, 39 S.Ct. 375, 378, 63 L.Ed. 772 (1919) (“the main source of the commission’s influence to prevent excessively low rates”- — • e.g., those intended to effect “the elimination of water competition”- — -“lies in its *370 power to prevent unjust discrimination”). That Congress was deeply familiar with the Supreme Court’s competition jurisprudence is beyond doubt.
And that Congress intended to adopt and apply large swaths of existing competition law to the packing industry is also apparent. The legislative history of the PSA is voluminous and (as for most laws) not entirely unambiguous, in certain respects. Where it lacks ambiguity, however, is in its reflection of the usage and plain meaning of words like “unfair” and “unreasonable” as used in § 202. As Judge Reavley’s opinion ably demonstrates, the immediate purpose of the PSA was to prevent the abuse of monopoly and restraint of trade by the “Big Five” meat-packers. See, e.g., Committee on Agriculture of the House of Representatives, Hearing on Meat Packers, May 2, 1921, at 12 (discussing, in brief, “the necessity for this legislation”: preventing the packers from “combination, apportionment of territory and of markets, as well as the oppression of competitors”). Achieving this purpose, supporters stated, would ultimately aid farmers and growers and reduce the price of food for consumers. See, e.g., Hearing on Meat Packers, at 54 (statement of National League of Women Voters); H.R. Rep. 85-1048, at 1 (1957). The means to these ends, it has been recognized, was to improve the competitive environment:
The act provides that meatpackers subject to its provisions shall not engage in practices that restrain commerce or create a monopoly. They are prohibited from buying or selling any article for the purpose of or with the effect of manipulating or controlling prices in commerce. They are also prohibited from engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business, or conspiring, combining, agreeing, or arranging with other persons to do any of these acts.
Id.[5]
In sum, the evidence of Congress’s intent, while not itself dispositive, confirms, and does not repudiate, the view that the broad words of § 202 were to be considered in light of their established meanings, as terms of art limited to competitive wrongs.
The structure of the statute does not countervail. The dissent suggests that, because §§ 202(c), (d), and (e) explicitly prohibit certain acts that have anticompetitive effect, (a) and (b) must strike at something different, apart from injury to competition. This construction is necessary, says the dissent, to prevent subsections (a) and (b) from swallowing, and rendering superfluous, subsections (c), (d), and (e). Further, it argues that subsection (e), rather than (a) and (b), is the true catch-all for anticompetitive behavior.[6]
*371 That construction does not accord with the text of the statute. Subsection (c) proscribes the apportioning of supply in restraint of trade. Both subsections (d) and (e) proscribe manipulation of prices, and all three subsections proscribe specific actions that may create a monopoly. These subsections do not reach facts that may constitute certain familiar antitrust violations, e.g., refusals to deal, boycotts, non-price restraints such as credit or quality terms, tying agreements, even mergers or joint ventures. They simply do not cover the waterfront of anticompetitive behavior. Moreover, if (a) and (b) are to be read as literally as the dissent suggests, they seem to swallow (c), (d), and (e) and render those provisions superfluous. Similarly, if subsection (e) is a catch-all for anticompetitive behavior, it would render superfluous subsections (e) and (d).
The more natural reading, which avoids these infirmities, is that subsections (a) and (b) are catch-all provisions, intended to cover whatever actions create an actual or potential restraint of trade. Subsections (c), (d), and (e) prohibit specific practices only if they adversely affect competition, while (a) and (b) still deal with the marketplace but in a broader way than (c), (d), and (e). None of the text is superfluous.
Because of their provenance, the words of §§ 202(a) and (b) of the Packers and Stockyards Act are susceptible to a plain meaning: To prove that a practice is “unfair,” “unjustly discriminatory,” or an “undue or unreasonable preference,” a plaintiff must demonstrate an actual or potential adverse impact on competition. For this reason, as well as those identified by Judge Reavley, I believe that this court should decline this invitation to upset the Act’s long-established meaning.

. As amended and codified. The amended text differs in no relevant respect from that enacted in 1921. See Packers and Stockyards Act of 1921, Pub.L. No. 67-51, § 202, 42 Stat. 159, 161 (1921); Pub.L. 74-272, 49 Stat. 648, 649 (1935) (amending § 202 to reach live poultry dealers and handlers); Pub.L. 85-909, § 1, 72 Stat. 1749 (1958) (amending § 202 to reach, inter alia, activities of packers relating to livestock and poultry).

. See, e.g., A.L.A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 530-33, 55 S.Ct. 837, 843-44, 79 L.Ed. 1570 (1935) (the term “fair competition” does not provide an “adequate definition of the subject to which the codes [promulgated under § 3 of the National Industrial Recovery Act] are to be addressed”).

. Gratz was overruled by Federal Trade Commission v. Sperry & Hutchinson Co., 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), on the basis of the FTC Act’s legislative history. That fact has little relevance to the established meaning of "unfair” at the time of the PSA’s enactment. Further, the grounds for S&H— that the FTC Act was intended by Congress as both an antitrust and a consumer-protection statute — do not apply to the PSA, which regulated the dealings of packers, and later of poultry processors, that operated at the manufacturer and wholesale levels. For these reasons, S&H is inapplicable.

. Thus, it came to be that carriers could, in certain competitive circumstances, charge lower tariffs for longer than for shorter distance over the same track, despite § 4’s apparent prohibition on this practice. The court's explanation for this seeming departure from the statutory text is instructive: "In considering the act comprehensively it was pointed out that the generic provisions against preference and discrimination expressed in the 2d and 3d sections of the act were all-embracing, and were therefore operative upon the 4th section as well as upon all other provisions of the act.” United States v. Atchison, T. & S.F.R. Co. (Inter-Mountain Rate Cases), 234 U.S. 476, 482, 34 S.Ct. 986, 990, 58 L.Ed. 1408 (1914). This general rule was animated, and also limited, by the competitive-effects test the court considered inherent in §§ 2 and 3:
[W]here competitive conditions authorized carriers to lower their rates to a particular place, the right to meet the competition by lowering rates to such place was not confined to shipments made from the point of origin of the competition, but empowered all carriers, in the interest of freedom of commerce and to afford enlarged opportunity to shippers, to accept, if they chose to do so, shipments to such competitive points at lower rates than their general tariff rates: a right which came aptly to be described as "market competition” because the practice served to enlarge markets and develop the freedom of traffic and intercourse.
Id. at 483, 34 S.Ct. at 990. Congress subsequently amended the ICA to ratify this approach, as concerned competition between the railroads and cargo vessels. See Pub.L. No. 61-218, § 8, 36 Stat. 539, 547-48 (1910).

. This was also the understanding of the Congress that amended the PSA to reach live poultry sales, as stated in a statutory finding. See Pub.L. 74-272, 49 Stat. 648 (1935) (stating the necessity of regulation to curb practices that resulted in producers "receiving prices far below the reasonable value of their live poultry” and "unduly and arbitrarily enhancing the cost to the consumers” and that were therefore an "undue restraint and unjust burden on interstate commerce”).

. In this, the dissent abandons, in part, its hyper-literalism. To the dissent, § 202(e)'s prohibition on acts that have the effect of "restraining commerce” is merely a “ 'catchall' for the competitive injury sections.” But read literally, it is far more than that. The term "restraining commerce” is "broad enough to embrace every conceivable contract or combination which could be made concerning trade or commerce or the subjects of such commerce.” Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). The simple formation of a partnership does, in a literal sense, restrain commerce: the partners agree not to *371 compete against one another. Few would argue, though, that every partnership, or indeed every commercial contract, is a "restraint on commerce.”