LOUISVILLE & N. R. R. v. INTERSTATE COMMERCE COMMISSION
(UNITED STATES, Intervener).

(Commerce Court. February 28, 1912. Dissenting Opinion, March 12, 1912.)

No. 4.

**1.** COMMERCE (§ 85*)—INTERSTATE COMMERCE COMMISSION—POWER TO FIX RATES—LIMITATIONS.

While section 15 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 (U. S. Comp. St. 1901, p. 3165), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1909, p. 1158), confers power on the Interstate Commerce Commission "whenever after a full hearing on a complaint * * * it shall be of the opinion" that a rate or charge of a carrier is unjust or unreasonable to prescribe "just and reasonable maximum rates," the conclusion of the commission that the existing rate established by the carrier is unjust or unreasonable, and its order establishing a new rate, must be sustained by substantial evidence adduced at such hearing.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.*]

**2.** COMMERCE (§ 87*)—INTERSTATE COMMERCE COMMISSION—FIXING RATES.

In the investigation of rate cases, comparisons are very commonly made, and the Interstate Commerce Commission may receive evidence of such a kind, giving to the facts shown their proper value without proof of similarity of conditions.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 139; Dec. Dig. § 87.*]

**3.** CARRIERS (§ 26*)—INTERSTATE COMMERCE COMMISSION—FIXING RATES—REASONABLENESS OF EXISTING RATES.

That a railroad company increased a rate from what it had previously been raises no presumption, as the law formerly stood, that the new rate is unjust or unreasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

**4.** CARRIERS (§ 26*)—INTERSTATE COMMERCE COMMISSION—FIXING RATES—REASONABLENESS OF RATES.

A rate voluntarily established by a railroad company to meet competition is not to be taken as the measure of what is reasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

**5.** CARRIERS (§ 26*)—INTERSTATE COMMERCE COMMISSION—FIXING RATES—REASONABLENESS OF EXISTING RATES.

The mere fact that a rate established by a carrier is higher one way between the same points than it is the other does not prove that the higher rate is unreasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

**6.** CARRIERS (§ 26*)—INTERSTATE COMMERCE COMMISSION—FIXING RATES.

That advances made in shipping rates on certain classes of goods would be severely felt by certain shippers is not a sufficient reason for holding that they were not properly made, as any change in market conditions which affected the cost of handling would necessarily be felt.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

**7.** COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—ORDER FIXING RATES—REVIEW BY COURTS.

An order of the Interstate Commerce Commission fixing rates to be charged by a carrier is not conclusive and exempt from review by the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

courts, on the ground that it is not sustained by the evidence aside from the question whether it is confiscatory or not.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

8. COMMERCE (§ 85*)—INTERSTATE COMMERCE COMMISSION—ORDER FIXING RATES—VALIDITY.

In 1886, by what was known as the Cooley Arbitration, a basis of relative rates was established between points on the Ohio and Mississippi rivers and points in the southeast territory, which basis, with modifications made necessary by the construction of a new short line between Memphis and Birmingham, Ala., has been substantially maintained by all railroads since. The Louisville & Nashville Railroad Company, however, to meet water competition, reduced certain of its class rates between New Orleans and Mobile and Pensacola, leaving its other rates unchanged, the effect of which was to make its rates from New Orleans to Montgomery, Selma, and Prattville, Ala., and to points based thereon, through Mobile or Pensacola, higher than the sum of the two local rates. All such rates were maintained for many years; but in 1907, complaint having been made because the through rates to the Montgomery-Selma territory exceeded the sum of the locals, the company restored the rates from New Orleans to Mobile and Pensacola, leaving the through rates, which then exactly equaled the sum of the locals, unchanged. On complaint and after a hearing, the Interstate Commerce Commission made an order reducing the rates from New Orleans to Mobile and Pensacola to where they stood prior to 1907, and also reducing the through rates to the Montgomery-Selma territory to the sum of the new locals so fixed. Held, on the record, that such order was beyond the powers of the commission and invalid, as not supported by any substantial evidence showing that the rates complained of, established by the company, either to Mobile and Pensacola or to the farther points, which were in conformity to the basis established by the Cooley Arbitration, were unjust or unreasonable in themselves.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.*]

Mack, Judge, dissenting.

Suit by the Louisville & Nashville Railroad against the Interstate Commerce Commission, respondent, the United States intervening respondent, to annul an order made by the commission. Decree for petitioner.

For opinion of Interstate Commerce Commission, see 17 Interst. Com. Comm. R. 231.

For opinion of Circuit Court, refusing preliminary injunction, see 184 Fed. 118.

Helm Bruce and W. G. Dearing, for petitioner.

W. E. Lamb, for Interstate Commerce Commission.

J. A. Fowler, Asst. Atty. Gen., and Blackburn Esterline, Sp. Asst. Atty. Gen.

Alfred P. Thom and Walker D. Hines, for Southern Ry.

Edward Barton, for Baltimore & O. S. W. R.

Before KNAPP, Presiding Judge, and ARCHBALD, CARLAND, HUNT, and MACK, Judges.

ARCHBALD, Judge. A brief history of this case will aid in understanding the questions to be decided. For a number of years prior to 1907 the through rates on certain classes of freight over the Louis-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ville & Nashville Railroad. the present petitioner, from New Orleans, La., to Montgomery, Selma, and Prattville, Ala., were higher than the rates on the same classes from New Orleans to Mobile, an intermediate point, plus the rates from Mobile to Montgomery and the other places mentioned. The through rates from New Orleans to these places were also similarly higher than the rates to Pensacola plus the rates from there to the same destinations; the two situations in this respect being identical. This somewhat peculiar condition was brought about, as it is alleged, by the fact that the rates from New Orleans to Mobile and Pensacola were made lower than might justly have been charged, as well as lower than the general basis of rates prevailing in that section of the country, because of the necessity for meeting water competition between these places, from which policy it resulted, as is to be gathered from the record, that the rail line of the petitioner greatly increased its tonnage, and eventually secured the bulk of the traffic, the rail rates being continued for a number of years after the water competition had practically been eliminated.

Following, however, the enactment of the Hepburn law in 1906, the Interstate Commerce Commission in an administrative ruling, which has several times been reaffirmed, announced that through rates in excess of the combination of intermediate rates would be regarded as prima facie unreasonable, and that the burden would be on the carrier to defend them. Subsequently to this, and possibly prompted by it, in June, 1907, the Montgomery freight bureau, on behalf of the commercial interests of that city, filed with the Commission a formal complaint against the railroad, alleging that the higher through rates to Montgomery than the combination on Mobile, on certain classes and commodities, subjected Montgomery to undue prejudice and disadvantage, in favor of Mobile, in violation of section 3 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]). Influenced by this, no doubt, and by the ruling of the Commission referred to, the railroad on August 13, 1907, advanced its rates from New Orleans to Mobile and Pensacola on certain classes of freight by varying amounts sufficient in each case to make the new combination on Mobile and Pensacola correspond with the through rate to Montgomery. This action of the railroad, coupled with subsequent reductions on a number of articles, by taking them out of their respective classes and giving them special commodity rates, apparently had the effect of satisfying the commercial interests of Montgomery, and nothing further seems to have been done in consequence upon the complaint filed by the freight bureau of that city.

This did not, however, satisfy all parties. For a number of years the rates out of New Orleans had been the subject of agitation by the New Orleans Board of Trade, and at various dates, in October and November, 1907, complaints were accordingly filed with the Commission by that body, severally charging that the rates to Mobile and Pensacola as recently advanced by the railroad, and the through rates to Montgomery and the points grouped with or based thereon, were unjust and unreasonable in themselves as well as in comparison with the rates from Memphis, St. Louis, and Louisville. A restoration of

the rates in effect to Mobile and Pensacola prior to August 13, 1907, was thereupon prayed, and a reduction of the rates to Montgomery, so that they would not exceed a combination of the locals by way of these places as thus established. The adjustment of certain commodity rates relatively to St. Louis and Memphis was also asked for.

The railroad duly answered these complaints, denying that the rates in force were unjust or unreasonable, and setting forth in detail the facts and circumstances relied on to justify them. But, after answering and before any hearing by the Commission had been entered upon, the railroad voluntarily established special commodity rates on a number of articles which had been complained of, thereby making the rates on all articles, or at least on most articles, from New Orleans to Montgomery points, as well as to Mobile and Pensacola, the same as or lower than the rates from Memphis and the other places named to these destinations. This was the undoubted intention of petitioner, and appears to have been generally if not completely carried into effect.

The three New Orleans cases were heard by the Commission together, and were disposed of November 26, 1909, in a single report and order. This order, in substance, condemned the advance in rates to Mobile and Pensacola on the classes involved as unjust and unreasonable; directed the restoration of the rates in force prior to August 13, 1907, to these places; declared the through rates to Montgomery, Selma, and Prattville, to the extent that they exceeded the sum of the locals by way of Mobile and Pensacola prior to that date, to be also unjust and unreasonable; and prescribed for the future certain maximum rates to be maintained by the railroad for the statutory two-year period. The rates which were so prescribed to Mobile and Pensacola were the same in each case as the rates which had existed prior to the advance made by the company, and the rates to Montgomery were exactly equal to the rates to Pensacola and Mobile as so restored, plus the rates from these places to Montgomery, which remained unchanged; the rates to Selma being made up in the same way, and those to Prattville having the prevailing arbitrary added. This order, by its terms, was to go into effect February 1, 1910, but was postponed by supplemental orders until April 15 following, prior to which time a bill in equity was filed by the railroad against the Commission in the Circuit Court of the United States for the Western District of Kentucky, and an application made for a preliminary injunction. This application was heard by three circuit judges on bill and affidavits, and was denied by the court in an opinion by Judge Severens (184 Fed. 118), after which the order of the Commission became effective and has since been complied with.

The Commission having answered the bill, an examiner was appointed and a large amount of testimony taken on behalf of the petitioner, the entire proceedings before the Commission, including the testimony submitted to it, being also under objection made a part of the record. No proof was offered in opposition to this in support of the order, the Commission taking the position that having been made after a full hearing, upon due consideration of the issues involved and in the exercise of the authority conferred by the statute,

the order was not open to question. Upon the organization of the Commerce Court, the case was transferred here, and now comes up for disposition upon final hearing. [1] It has been ably and elaborately argued in all its different phases, but there is only one that it seems necessary to pass upon, and that is whether the Commission, in the order which it has made, has not in a legal sense acted, as charged, in such an unreasonable manner that its order is invalid, having nothing of substance or persuasive force upon which it can rightly be predicated. This is claimed to result because the reasons assigned in the report either do not justify the conclusion reached or are so at variance with the undisputed facts that effect has plainly not been given by the Commission to the evidence which was produced before it; and therefore, as it is put in the petition—repeated frequently in various connections—the "order is unreasonable, unjust, unlawful, arbitrary, and oppressive and in excess of the authority granted and powers conferred upon" the Commission by the amended act to regulate commerce. Stated in another form, the question is whether the order, tested by the principles recently emphasized by the Supreme Court in Interstate Com. Com. v. Union Pacific R. R., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. ——, should not be set aside because there was no substantial evidence to sustain it. That is to say, whether the Commission, while in form acting within the authority conferred by the statute, has not in effect disregarded it. And it is to this question that we therefore address ourselves.

In this connection we take occasion to say that, if the conditions dealt with in the report of the Commission were substantially as they are there described, we should have little hesitation in dismissing the petition; for, even though in that case it might seem doubtful to us whether the Commission had reached a just conclusion, it would nevertheless appear that there was room for differences of opinion, because different inferences were able to be drawn, and in such case the conclusions of the Commission should be accepted as to matters thus clearly within its jurisdiction. But the question here is whether the report can fairly be regarded as of that character. On the taking of testimony in the Circuit Court after the preliminary injunction had been refused, the entire evidence before the Commission was introduced into the record, and it is to that evidence that reference is made in this opinion unless otherwise stated. That evidence we have read and reread with the utmost care, and it is because of our inability to understand how, on the facts which there appear, the report before us could have been made, that the difficulty under which we labor arises.

By the express provisions of the statute (section 15), before going on to prescribe future rates, the Commission must reach the conclusion that the existing rates established by the carrier are unjust and unreasonable. It is the duty and the privilege of the carrier in the first instance to fix the rates to be charged (Inter. Com. Com. v. Chicago Great Western Railroad, 209 U. S. 108, 119, 28 Sup. Ct. 493, 52 L. Ed. 705), and it is only where after due notice and a full hearing—whether on complaint of a shipper or upon investigation by the

Commission of its own motion—it is made to appear that the rate is unjust and unreasonable that the Commission is empowered to fix another. The hearing which is so provided for is not a perfunctory one. The carrier is entitled to know and to rely on what is adduced at it, either for or against the existing rate, and the Commission is not authorized to disregard it and reach a conclusion not at all justified by it. If the rate attacked is shown to be unjust, it may be abrogated and a new one established. But, if that is not the outcome of the hearing, and, on the contrary, it is clearly shown that the rate is not unjust, the evidence as to this cannot be put aside, and if it is, and the Commission without reference to it proceeds to condemn the rate and to fix another, its action is invalid.

After the most careful consideration, we are forced to conclude that the action of the Commission in the present instance is of that character. Having regard to the evidence, the only tangible ground upon which it will be found to rest is the fact that there had been an advance in the rates to Pensacola and Mobile, and that the Montgomery rate exceeded the sum of the rates through these points as they stood prior to this increase, making the increase in these intermediate rates the only proof of unreasonableness, not only as to Pensacola and Mobile, but Montgomery also. It is conceded by counsel for the government that, if this were true as to the rates to Montgomery, the order of the Commission would be invalid, because it would not be based on the reasonableness or unreasonableness of these rates independently considered. And it is just as clear that if the reduction to Mobile and Pensacola was a mere restoration of the rates previously in force, based solely on the advance made by the railroad, it is equally indefensible. And, taking the case as it stands, there is practically nothing else, as it seems to us, that can be made out of it. Not but that other reasons are given by the Commission. But it will be found upon examination, as stated above, either that they are entirely unsupported by the evidence or are involved in such capital mistakes with respect to it, or are in themselves so inconsequential as to the reasonableness or unreasonableness of these rates, that nothing can be consistently predicated upon them. And this we will now endeavor to demonstrate.

The New Orleans-Montgomery rate, which has been set aside by the order of the Commission, was one of very long standing, and was established with great circumspection. In 1886 Hon. Thomas M. Cooley, whose attainments are too well known to dilate upon, the first chairman of the Interstate Commerce Commission, was called upon by the railroads running into what was designated as the southeastern territory to arbitrate and adjust the relative rates from crossing points on the Ohio and Mississippi rivers to certain places such as Montgomery and others within the section of country roughly described as lying between the Memphis & Charleston Railroad on the north, the Gulf of Mexico on the south, the Chattahoochee river on the east, and the Mobile & Ohio Railroad on the west. He was not to determine specific rates, but their relation to each other. This question had first been submitted to Mr. James R. Ogden, as commissioner of certain associated railroads running into this territory, and, after he

had passed upon it, it was submitted to Judge Cooley, who virtually affirmed Mr. Ogden's ruling.    So far as the present comparison is concerned, it is sufficient to note that it was thereby decided that the rates from Louisville, Evansville, Cairo, and other like points on the Ohio river, to Birmingham, Montgomery, Selma, and other points within the defined territory should be the same; that the rates from East Cairo, Columbus, Hickman, and points on the Mississippi in Kentucky should be two cents less; and that the rates from Memphis, Vicksburg, and New Orleans should be four cents less.    An adjustment of rates was made by the railroads in accordance with this, including those from New Orleans to Montgomery and other points in that section, and these rates were maintained, at least so far as class rates are concerned, until the building of the Kansas City, Memphis & Birmingham Railroad from Memphis to Birmingham, which made a very much shorter line than had previously existed between these cities, when the rates on the first six classes of freight from Memphis to Birmingham were greatly reduced below what they had been, and those from New Orleans to Birmingham were also reduced to correspond relatively, in accordance with Judge Cooley's adjustment. The reduction from New Orleans to Birmingham, however, proved too great and could not be maintained, and the rates between these places were at first restored to the original figures, and then reduced to an intermediate position; and this brought about a reduction on rates for these classes between New Orleans and Montgomery, Montgomery being intermediate to Birmingham.    The final adjustment of these rates was reached in 1896, and as fixed at that time they remained substantially unchanged until 1910, a period of 14 years, when the Commission made the order in question.

The original careful determination of the New Orleans-Montgomery rates, in their relation to those from Ohio and Mississippi river points into the same territory, in accordance with the Cooley Arbitration, the subsequent readjustment of them upon the building of the Memphis and Birmingham short line, and their long continued acceptance by the business public, during which time freight moved freely under them, all strengthen the presumption in favor of the reasonableness of these rates, against which there is practically nothing to militate except the previous competitive water rates from New Orleans to Mobile and Pensacola, and the combination to be made on them to Montgomery.    The conclusion is thus forced, and indeed is patent on the face of things, that the Montgomery through rates as now fixed by the Commission are nothing more than the restored competitive Mobile and Pensacola rates plus the previous rates from those places to Montgomery.

There is no change, as it will be noted, in the rates from Mobile and Pensacola to Montgomery.    The change in the Montgomery through rate is effected by reducing the rates from New Orleans to the intermediate points named and combining them with the rates from there to Montgomery, the reduction in the New Orleans-Montgomery through rates being exactly the same as the reduction made in the rates to Pensacola and Mobile as to every class except one— class E—where the through rate is reduced 1 cent, as against a five-

cent reduction to Mobile, and none at all to Pensacola. This coincidence is too significant to be a mere accident, or to fail to reveal the consideration which influenced it. It extends to the through rates to Selma and Prattville, as well as to Montgomery, not only by way of Mobile, but of Pensacola also, an exactitude which it is impossible to account for except upon the ground which has been suggested. Not only is the reasonableness or unreasonableness of the through rates, to Montgomery, as fixed by the Commission, thus made to depend on the reasonableness or unreasonableness of the Mobile-Pensacola part of them, but they are all obliged to stand or fall on the fact of this coincidence, by which, as conceded by counsel, they are not able to be defended. It is true, as already stated, that there are other reasons assigned by the Commission in its report for the reduction in the New Orleans-Montgomery rates, but, with due respect to the Commission, they do not bear up under examination.

The relation of rates established by the Cooley Arbitration and the disturbance inevitably to result from a disregard of it was pressed upon the Commission as strong grounds against the proposed changes. "The Cooley Arbitration of 1886," it is said in the report, "has been strongly urged * * * as a reason for the nonreduction of the present advanced rates. This arbitration established a relation of rates as between the several Ohio and Mississippi river crossings, applying upon products from the territory north and west of those rivers destined to southern and southeastern territory, by fixing a basis for making rates from these several basing points to the southeastern territory, with the object of maintaining an equitable relation and equality of the basing rate, as between said points on goods transported to southeastern territory, but we do not understand that this arbitration undertook to fix the actual rates for carriage from the several basing points to destinations in this territory. However, if such were the case, the building of new railroads, competition, and other causes forced many departures from the adjustment and the rates made under it, until it has become materially altered, and it is inevitable and proper that it should yield to meet new and changed conditions."

From this, which is all the Commission has to say on the subject, it would be supposed that the Cooley award was only a basis of adjustment accepted many years before, but which had come to have little more than historical value. In other words, that it was merely a starting point from which departures were frequently and freely made. If this were so, the Commission might properly regard it as of no great importance and certainly as furnishing no substantial obstacle to further modification by the reduction of rates from New Orleans. But the record before the Commission, as we read it, does not warrant the inference apparently intended from the statement above quoted. Taken by itself, the statement is not literally inaccurate, since it seems that some changes were made at various times in the rates on particular articles by taking them out of their respective classes and giving them special commodity rates, and to such extent as changes of this character were made they may be regarded in a sense as departures from the Cooley Arbitration basis. Moreover, the fact that the complaint of the New Orleans Board of Trade embraced

in terms commodity rates as well as class rates, and that there was more or less testimony at the hearing which must have related to commodity rates, doubtless accounts for what the Commission says upon this subject. But when it is remembered that no change of consequence in class-rate relations had taken place since the original adjustment, except the one heretofore explained, and that the order in question pertains only to class rates from New Orleans, the matter presents itself in a very different aspect. Surely the long continuance of these class rates, which are the basis of the rate structure in that territory, and which must be assumed to have been equitably adjusted as between the various competing towns on the Ohio and Mississippi Rivers by the Cooley award, was a valid and persuasive objection to any order which would have a disturbing effect upon the class-rate situation. Nor was the force of this objection appreciably lessened by the circumstance that some articles were taken out of the classes from time to time and given commodity rates. Particularly is this so in view of the fact that the Commission's report contains no intimation that class rates from other points should be reduced, clearly indicating that the order in question was not predicated upon any finding or contention that this class-rate adjustment was unfair to New Orleans. When, therefore, the facts in this regard are fully perceived, their important bearing upon the controversy seems evident, and they are not to be dismissed from consideration, as they appear to be by the Commission, on the mistaken view that "the building of railroads, competition, and other causes had forced departures from the adjustment of rates under it until it had become materially altered, as was inevitable and proper to meet changed conditions," as suggested.

As a further reason for making the order in question, the report of the Commission contains the following:

"It was stated by the principal witness for the defendant that between points on its line where the through rate exceeded the combination of rates from point of origin to a competitive point and from said competitive point to destination shippers were given the benefit of the combination rate, and this provision appeared in special circulars and was very generally observed as a rule for the adjustment of freight rates; and, such having been formerly the custom of the defendant, it would seem now to work no especial hardship upon it to reduce rates to the basis of the former combination."

The reference here is to the testimony of Mr. C. B. Compton, the traffic manager of the Louisville & Nashville Railroad, who has been with that road in continuous service in various capacities for some 40 years. But a careful reading of his testimony discloses no basis for the statement quoted, if it was meant thereby to imply that the Mobile combination was at any time allowed on through shipments to Montgomery. On the contrary, it clearly appeared that such shipments had always paid the Montgomery rate, and that the Mobile combination could be secured only by shipping first to Mobile and then reshipping to Montgomery, as seems to have been done in a few instances. Indeed, this is recognized as the fact by the Commission, since it is stated in an earlier part of the report that:

"Prior to August 13, 1907, shippers, in order to get the benefit of the lower combination, sometimes shipped locally to Mobile and then reshipped to Montgomery, Selma, and Prattville."

Of course, if the fact had been otherwise, and the road had ordinarily or frequently carried Montgomery traffic on the Mobile combination, the Commission might well say that it would be no great hardship to require the carrier to publish in its tariff the actual rates which it habitually accepted; but the undisputed evidence shows that the full Montgomery rate was constantly applied to Montgomery shipments, and we fail to see how that circumstance tended to show that the Montgomery rate was unreasonable.

It is undoubtedly true, as testified by Mr. Compton, that it was a more or less general practice to protect through shipments against the combination of locals, and a rule to that effect was carried by his road in certain of its local tariffs; but there was no such rule in the tariffs naming rates to Montgomery territory, and nothing whatever appeared at the hearing to indicate that through traffic to Montgomery was ever carried at less than the Montgomery rate. A colloquy occurred in the course of Mr. Compton's examination in which he seems to have admitted that the rule in the local tariffs referred to, not being limited in terms, might be claimed to have authorized the application of the Mobile combination to Montgomery shipments. But the point is not what those tariffs might have been construed to mean, but what the actual practice was in respect of the traffic in question. Evidently the road was always careful to maintain this Montgomery rate. Everything indicates that it consistently did so. And it seems plain to us that the acceptance on other parts of the system of combination rates which were lower than through rates had no tendency to show that these particular rates were unreasonable. In short, when the undisputed facts regarding this feature of the case, as they appeared before the Commission, are taken into account, they not only do not sustain the conclusion of the Commission, but seem to be rather of contrary import.

With respect to the through rates from New Orleans to Montgomery, as well as the southeast territory generally, it is further said by the Commission, in justification of its action, that:

"It was shown that the merchants of New Orleans have heretofore made ineffectual efforts to secure better rates to this territory, as higher rates were in effect from New Orleans to this territory than existed from distributing centers at greater distances west and north of said territory, the situation being such that New Orleans was cut off from the trade of this section as to many products, and greatly restricted and burdened as to many others, on account of the high rates of transportation."

Tested by the complaints of the New Orleans Board of Trade, which, as above shown, embraced in general terms commodity rates as well as class rates, this statement cannot be said to be wholly incorrect. Prior to the adjustments already referred to, and which were voluntarily made by the carrier months before the order in question was issued, it was perhaps true that New Orleans merchants were at some disadvantage because the class rates from New Orleans on certain articles may have been higher than or out of line with the commodity rates from other points on those articles. But this cause of complaint, to whatever extent justified when the proceedings before the Commission were instituted, was substantially, if not wholly, removed before

the hearing was concluded by the reductions and adjustments hereinbefore mentioned, which resulted in actual rates from New Orleans lower on most articles, and not higher on any article than rates from Memphis and other points west and north of Montgomery. And this was apparently recognized by the Commission to be the case, since it made no order respecting commodity rates. But when the paragraph quoted is tested by the class rates, which are the only ones reduced by the Commission's order, it is not only not supported by the testimony, but the contrary is shown by proof that is not open to question. Instead of being discriminated against by the class rates to Montgomery territory, New Orleans has had an actual advantage over the Ohio and upper Mississippi river towns, an advantage over Memphis in the higher classes and at least equality with it in the other classes, and an equality with Huntington, Vicksburg, and the lower Mississippi points to Memphis, all of which is established by comparative tables which stand unchallenged and by the tariffs, as we are advised, then on file with the Commission. So far, therefore, from sustaining the action of the Commission, the undisputed facts in this regard tend unmistakably to a contrary conclusion.

But the Commission also mentions that the rates from New Orleans to Montgomery, Selma, and Prattville were higher on all the classes than those from typical points in the southeast, where the distances were greater, such as Brunswick and Savannah, Ga., Charleston, S. C., Wilmington, N. C., and Nashville, Tenn., to say nothing of Virginia and North Carolina points, which are referred to in another connection. But in this comparison the Commission for its initial points goes over into an entirely different territory. It leaves the Mississippi and Ohio rivers and goes to the Atlantic coast in the Carolinas and Georgia, without any suggestion that traffic conditions from there to Montgomery and Selma are at all similar to those from New Orleans, which is the subject of comparison; the only basis of contrast being one of distance. The railroad company in its bill makes complaint of this, and avers that the conditions are so dissimilar as to render the comparison unjustified, and that no issue as to the reasonableness or unreasonableness of the rates so applied as a standard was made, nor any evidence introduced which was addressed to that inquiry. And this the Commission in its answer admits, conceding that there was no fixed relation between the rates from these points and those from New Orleans, which we understand to mean no definite or determining relation.

So also with regard to the rates "from New Orleans to certain stations just outside of Montgomery on the Mobile & Ohio Railroad," which are said by the Commission to be less than the rates to Montgomery by the Louisville & Nashville. The bill avers that these were unimportant local points, which did not enter into competition with Montgomery; that the traffic to them was insignificant; that no testimony was taken concerning them; and that the Louisville & Nashville Railroad does not publish or participate in or have anything to do with them. And the Commission, answering this, admits that the reasonableness of the rates to these local points was not in issue, and that no attempt was made to determine whether or not they were rea-

sonable, and that it did not undertake to determine the reasonableness of the rates prescribed in the order complained of on the basis of the rates referred to. But, if all this be so, it is difficult to see why there was any reference made to them at all, or why they were put forward by the Commission, in the way they were, to justify the order, if they had no influence upon it. The effect of the answer, therefore, is to eliminate this part of the report, aside from the other considerations which also do so.

Equally immaterial is the statement that the rates from Virginia cities to Montgomery and Selma are less than from New Orleans, although covering twice the distance, or that those from north Atlantic ports to points in the southeastern territory basing on Montgomery are more favorable, length of haul and number of lines considered, which are some of the minor things entering into the decision. And especially is this to be said of the water rates from New York and Boston to Mobile and New Orleans, which have no perceptible bearing on the rail rates between the latter two places in the connection in which they are cited.

By contrast with this, it might be inquired why the Commission in making comparisons took no note of the rates established by the railroad commissions of Alabama and Georgia, which show that, for 141 miles, the distance between New Orleans and Mobile, the accepted as controlling factor in the situation, the rates by the Louisville & Nashville Railroad, which have been condemned and reduced by the Commission as unjust and unreasonable, were materially less than the maximum or so-called standard tariff established by the Georgia commission, and much lower still than the rates which were permitted to the Southern Railway in Alabama, Georgia, Tennessee, and South Carolina, as will appear by the comparative table which is reproduced below, as taken from the evidence.

| | Class— | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | E. |
| Louisville & Nashville rates from New Orleans to Mobile, 141 miles | 50 | 39 | 38 | 31 | 27 | 16 | 20 |
| Southern Railway rates fixed by commissions of Alabama and Georgia for 141 miles.......... | 75 | 63 | 56 | 44 | 35 | 29 | 35 |
| Minimum or standard tariff of Georgia Railroad Commission, 141 miles ...................... | 60 | 50 | 45 | 35 | 28 | 23 | 28 |
| Southern Railway rates in Tennessee, 141 miles.................. | 58 | 50 | 46 | 37 | 31 | 27 | 32 |
| Southern Railway rates in South Carolina, 141 miles............. | 62 | 52 | 42 | 39 | 31 | 24½ | 31 |
| Southern Railway rates, Chattanooga to Birmingham, 143 miles.. | 57 | 49 | 41 | 32 | 27 | 19 | 27 |
| Southern Railway rates Birmingham, Ala., to Columbus, Ga., 157 miles ...................... | 57 | 49 | 45 | 35 | 28 | 22 | 27 |
| Southern Railway rates, Chattanooga to Atlanta, Ga., 138 miles.. | 52 | 45 | 41 | 32 | 25 | 20 | 27 |

[2] Let us not be misunderstood upon this point. We recognize, of course, that comparisons are very commonly made in the investigation of rate cases, and that they may often be quite persuasive. The competency of such evidence is not questioned nor the right of the Commission to give it due weight. Neither is it doubted that the Commission may receive evidence of this kind, giving to the facts so shown their proper value, without proof of similarity of conditions. But what we do hold is that the comparisons made by the Commission in its report in this case, taking into account all the facts and circumstances disclosed at the hearing, had no evidentiary bearing upon the reasonableness of the rates in dispute, and therefore furnish no appreciable support of the Commission's conclusion.

As a further justification for the reduction of the rates to Montgomery the Commission suggests that the rate per ton per mile, on an average of the first six classes of freight, is much greater from New Orleans than from Memphis, St. Louis, or Louisville. It is not said, as will be noted, that the rates to Montgomery are higher than from Memphis and the other places mentioned, but that, considering the distance, the rate per ton per mile is greater. But it is the ordinary and recognized rule that the ton-mile rate should decrease as distance increases, other things being equal, and we therefore fail to see how the lower ton-mile rate for the greater distances from Memphis, St. Louis, and Louisville tended in any respect to show the unreasonableness of the rates here in question.

Finally, as a summing up of this part of the case, the Commission says:

"The manufacturers and shippers of oil, paper, stovepipe, tinware, galvanized tubs, furniture, soap, window glass, paints, hardware, and other articles of like kind in daily use testified that they were unable to trade in the Montgomery and Selma territory on account of the high rates, and that upon former occasions they had made special efforts to build up a trade with cities located in this territory and points basing thereon, but in every instance they were compelled to abandon the fight on account of better freight rate concessions from other markets, though at greater distances. With respect to practically all of the commodities above enumerated schedules of comparative rates and distances were filed corroborating complainant's contention."

This statement also can be explained only on the theory that it relates to what the New Orleans Board of Trade alleged in its complaints and to conditions which may have existed in some degree before the road made the reductions and adjustments already mentioned. But having reference to the class rates in question, to which the Commission's order is confined, we are unable to find any evidence which tends to sustain the observations made with regard to the inability of New Orleans dealers to trade in the Montgomery-Selma territory.

Take, for instance, the testimony of George P. Thompson, a wholesale grocer of New Orleans, the first witness who has anything to say on the subject. His testimony has mainly to do with Mobile and Pensacola. But, being asked by counsel whether it would be possible to increase his business with Montgomery if the rates were adjusted on a fair basis, he says that it would, a self-evident proposition, but by no means showing that the rates in force were not what they ought to

be. The further statement which he is lead to make by suggestion of counsel that the rates from Memphis to Montgomery are lower than from New Orleans cannot refer to class rates; it being irrefutably· shown that they are in fact higher. And the comparison made by counsel in a long leading question with regard to the rates from Baltimore, to which Mr. Thompson gives hesitating assent, is of no more significance than the similar comparison with other North Atlantic points made by the Commission, already referred to. It is true that as to certain canned goods, such as beans and peas, he is handicapped, as he says, by the rates from such points as St. Louis and Memphis. But here again the reference must be to commodity rates which have been adjusted, and must have been so understood by the Commission, as it· does not include peas and beans in the list of articles said to be discriminated against by the rates to Montgomery. And this must also be kept in view when it is said by Mr. Thompson that he· is kept out of that territory unless he is willing to absorb a part of the rates, which is not true as to class rates, the only ones which are here in question.

W. O. Hudson, manager of the Marine Oil Company, the next witness, confesses that he knows nothing with regard to the Montgomery-Selma case. Being asked if he could do business in Montgomery if the rate were reduced to 13 cents a hundred, the reduction subsequently·made by the Commission, he declares that he could not, that the rate would eat him up; the explanation that he gives being that the great bulk of the oil which he handles comes from the Ohio and east-· ern fields, which are much nearer to Montgomery than he is. Notwithstanding this, and although he is the only witness who testified on the subject, oil is given by the Commission as one of the commodities shut out by the high rates from New Orleans into this territory.

E. C. Palmer, a wholesale paper man, admits that business with: Montgomery has not been materially injured by the advance in rates, but avers that it will be when his customers understand the situation.· He thinks that Nashville has an advantage over New Orleans in the rate on paper (as no doubt it has), and that, as compared with Balti-; more, considering the haul, the New Orleans rate is "a little out of line" (although it is not in fact higher); but that, compared with Louisville, it is fair enough. And, so far as being kept out of Montgomery is concerned, he says that, on the contrary, he ships there constantly. No one can read the testimony of this witness without being convinced that, except possibly as to Nashville, New Orleans is not only not discriminated against, but has an actual advantage in the rates on paper over every place that it comes in competition with in the Montgomery-Selma territory.

A. D. McBride, a salesman engaged with the National Enameling & Stamping Company, says that he sells goods in Mobile and Pensacola, but not in Montgomery or Selma, because Atlanta, Ga., has lower rates and gets the business. As compared with St. Louis and Louisville, he does not see that New Orleans is at a disadvantage, notwithstanding the efforts of counsel to have him say so. The competition which affects him is with Atlanta, and that is the whole of it. Nor even there does he charge that the advantage is an unfair one, but

simply that the Atlanta rate to Montgomery is lower, and keeps him out of there. Notwithstanding this state of the evidence, however, stovepipe, tinware, and galvanized tubs, the commodities that this witness deals in, he being the only one called to testify with regard to them, are included by the Commission among those which it is declared that New Orleans dealers on account of the high rates have been unable to sell in the Montgomery-Selma territory, being compelled to abandon the fight, as it is said, after an attempt to build up the trade, a statement as to which there is no approach in the testimony.

J. W. C. Wright, president of the New Orleans Furniture Manufacturing Company, says that Montgomery is not important to them. They ship some furniture there, but have not solicited the trade very strongly; and substantially the same thing is testified by P. Jung, of the Crescent Bed Company, an iron bed manufacturer.

S. Steinhart, a manufacturer of soap, sells soap in Montgomery, where he says he encounters a rate of only 19 cents from Nashville as against 23 cents from New Orleans, but there is no 23 cent class rate from New Orleans, and he must therefore be referring to a commodity rate, which, as we have already seen, has no bearing.

J. W. Bray, another witness, who is treasurer and manager of the Campbell Glass & Paint Company, says that they are shut out of Montgomery and Selma, the rates being such that they are unable to ship there. But, so far as the paint business is concerned, he also says that it is handled entirely from St. Louis, where his company has a house from which they prefer to ship, the rate being more advantageous; and that, as to their glass business, Montgomery is not a normal point for it, which hardly makes out that the rates from New Orleans are too high, or that he has ever tried unsuccessfully to adjust them.

Harry Moore, who is in the wholesale hardware business, declares that he cannot compete with St. Louis, Louisville, and Nashville; but he gives as a reason that, while these places are only one-half the distance from producing centers, such as Pittsburgh and that territory, they pay one-third the rate, and are thus able to get into Montgomery and Selma, and places basing on them, at much less than he can. But the discrimination here, as is evident, is in the rates from producing centers to the distributing points named; and it is impossible to expect that this should be made up to New Orleans by a back rate to Montgomery that would absorb the difference.

It is difficult therefore to see, in view of the testimony of these several witnesses, how furniture, soap, window glass, paints, and hardware were included as they are in the statement by the Commission, which has been referred to.

George Weigand, who is in the provision business, and who has been "howling to heaven," as he says, with regard to the rate increase complained of, refers only in this to the rates to Mobile, having never tried to go to Montgomery or Selma.

S. Odenheimer, a manufacturer of cotton goods, makes general complaint of the discrimination in rates from all competitive points where there are cotton mills to Montgomery and Mobile. But it appears

from his testimony that there are cotton mills at Montgomery and Mobile as well as at New Orleans, to say nothing of the other places mentioned, and it is altogether unreasonable to expect that rates on cotton manufactures should be put so low that mills at other points shall be able to compete with those actually on the ground. The Commission makes no reference to cotton goods in connection with the Montgomery rate, and therefore evidently took this view. Mention was also made by this witness that the rates southerly from Montgomery to New Orleans were lower than those northerly from the one place to the other. But the explanation given him by the company was that there are a good many empty cars going in the direction of New Orleans and none the other way, which might properly justify the distinction.

R. J. Wood, manager of the Gulf Bag Company, manufacturers of burlap bags, testifies that at one time, although not recently, they consigned goods to friends in Mobile to have them reconsigned to other points in Alabama, because the combination on Mobile was less than the rates through there. He also says that the question of the rates from New Orleans to Montgomery and Selma being higher than the combination on Mobile was an old one, and had been up ever since he was connected with the New Orleans Board of Trade, some seven years, complaint being made and efforts put forth to correct it. All that his company have ever asked, as he says, is the same rates that eastern ports have to points halfway distant to New Orleans, which they have never got, and are therefore at a disadvantage. They have better rates, comparatively speaking, according to this witness, to the Carolinas than to Alabama and Georgia, and there are 18 or 20 points in Georgia to each of which the mileage is less from New Orleans than from New York, Philadelphia, or Baltimore, and yet the rates are invariably higher, in consequence of which the southeast, for his company, is a dumping ground, where they get rid of any overplus, but do not expect to make money. They sell at Atlanta, but make nothing. That city is a bag consumer, but there is a bag concern there, and Atlanta itself complains of New Orleans. This extract from the testimony of this witness is perhaps unnecessary, as the Commission does not include burlap or gunny bags among the articles alleged to be discriminated against, so far as concerns the Montgomery-Selma territory. It is only Mobile as to which this is predicated with regard to these articles, and it will be noted that what he says has no application to Mobile.

In this connection a protest, dated August 6, 1902, drawn up by the attorney of the New Orleans Board of Trade, was introduced in evidence before the Commission, in which the existence of discriminating rates against New Orleans into the southeastern territory was charged, the fact that the through rate to Montgomery and Selma was higher than the Mobile combination being also mentioned. New Orleans and Mobile, as it is there contended, stand in the same relation to the sources of supply and are competitors to points beyond them, and claim is made that outbound rates from New Orleans should therefore carry but slight differentials. The rest of the paper is mainly an argument

why New Orleans should be put on an equality of rates which would permit of competition with New York and Baltimore as well as Georgia, the Carolinas, and Virginia—a broad question not in issue here, as already pointed out, and therefore not relevant or properly to be considered.

This completes the evidence on this branch of the case, and there is no need to dwell on the view to be taken of it. Considered severally or collectively, it contains nothing which we can discover that supports the conclusions of the Commission with respect to the Montgomery rates, outside of the fact that, if the reduction is to stand to Pensacola and Mobile, it calls for a reduction to Montgomery to equalize the sum of the locals. It is not simply that the weight of the evidence does not sustain the reasons assigned by the Commission in its report, but that there is no substantial basis for those reasons in the testimony passed upon.

[3] The Mobile and Pensacola rates remain to be considered, both on their own account and as the essential basis of the rates to Montgomery. It is to be noted with regard to these that as the law then stood the mere fact that they were increased by the company over what they had been previously creates no presumption that they were not fair and reasonable. Interstate Commerce Commission v. Chicago Great Western Railroad, 209 U. S. 108, 28 Sup. Ct. 493, 52 L. Ed. 705. Nor did it justify the Commission in putting them back to what they had been, without regard to whether that could be properly said of them. But this again is practically all that there is to sustain the Commission's action. It is undisputed that these rates to Pensacola and Mobile were the result of severe water competition, and that this had disappeared at the time of the increase. "At the date of the hearing," says the Commission, "carriage by water was infrequent and cut but little figure as a competitor" with the railroad. It is also stated that, while the rates by rail were generally higher than by water, this was not the case in the third, fourth, and fifth classes, under which the bulk of the freight between New Orleans and Mobile moved, notwithstanding which the Commission proceeded to reduce the rates for these classes to what they had been before, actually making them 6, 9, and 8 cents, respectively, below the established water rates as they then stood.

Take, also, the relative result brought about by the Commission's action. It may be that no point should be made of the fact that, taking the rate on first-class goods, which the Commission accepts as fair having made no change in it, the other rates are disproportionately low by comparison. This is the uncontradicted testimony of some of the witnesses, though it may be said that the Commission was not bound to adopt their view of it. But that there is a material disparity is observable on the face of things, and also that it breaks in upon the ratio established by the railroad, which was accepted and lived up to all these years—a somewhat significant circumstance. More than that, however, in making the rates on fifth and sixth class goods 35 cents each to Montgomery and 15 cents each to Mobile, while they are 20 and 15 cents, respectively, to Pensacola, the classification is inconsist-

ent, to say nothing of the testimony of some of the witnesses, who assert without contradiction that if 15 cents is correct for the sixth it is too low for the fifth class; while in fixing the rate of Montgomery at 77 cents on second class, and 55 on third class—based on a 37 and 25 cent rate to Mobile, respectively—there is a drop of 22 cents, which, according to the undisputed evidence, creates a disproportion between these two classes that is unprecedented in all that territory. And the same is true as to the 12 cent drop between these classes in the rate to Mobile, which is a reduction of 33 per cent. on the face of one and 50 per cent. on the face of the other, according to the one that is taken for comparison. It is no answer as to any of these Mobile rates that there were the same inconsistencies in the formerly prevailing rates of the railroad. These were competitive rates with respect to which nothing reliable can be predicated without knowing just what produced them. The resort to them for justification in this way merely serves to demonstrate the intimate relation which they bear to the order of the Commission..

It is said, however, in the report of the Commission that the Mobile and Pensacola rates had remained substantially unchanged for over 20 years, and that there was no evidence that they had not been compensatory. At the time this statement was made the increased rates were in force which were established in 1907, and not the old ones in existence before that. And it was the unreasonableness of these new rates which the complainants in the proceeding had the burden of showing. There was no adverse presumption to be indulged, as we have seen, because of the increase. Interstate Commerce Commission v. Chicago Great Western Railroad, 209 U. S. 109, 28 Sup. Ct. 493, 52 L. Ed. 705.

[4] Nor is a voluntary rate, established to meet competition, to be taken as the measure of what is reasonable, Lake Shore R. R. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858; Frederich v. N. Y., N. H. & H. R. R., 18 Interst. Com. Comm. R. 481, 484; Breese-Trenton Mining Co. v. Wabash R. Co., 19 Interst. Com. Comm. R. 598, 600. And yet that in effect is just what the Commission did in suggesting, in defense of the reduction and restoration which it under-took to make, that the previous rates were not shown negatively not to have been compensatory. It was not incumbent on the railroad at that stage to make this out, but on the complainant to show that the rates as they stood were unjust and unreasonable. The position taken here, on behalf of the Commission, is that a rate, however low, cannot be condemned as unjust if it yield any, the most insignificant, return above the cost of service, a proposition we are not prepared to accede to.

As further justifying the reduction made, it is declared by the Commission that the rates to Mobile and Pensacola exceeded the rates from New Orleans to other water-transportation points, such as Natchez, Vicksburg, Greenville, and Memphis, where the distances are greater. This clearly is not true as to Mobile, whatever may be the case as to Pensacola. The rates from New Orleans to the Mississippi River points mentioned, as contrasted with those to Mobile, according to

the schedule at the time on file with the Commission, will appear by the following table:

|  | Classes— | | | | | |
|---|---|---|---|---|---|---|
|  | 2 | 3 | 4 | 5 | 6 | E. |
| Rates to Natchez, Vicksburg, Greenville, and Memphis...................... | 40 | 32 | 25 | 20 | 17 | 15 |
| Rates to Mobile as reduced by the commission .......................... | 37 | 25 | 18 | 15 | 15 | 15 |

It may be that the Commission in the statement which it made had the rates in mind as raised by the railroad, as to which, however, it would be true only with respect to the third, fourth, and fifth classes. But that is not the way it is put, nor is it the use made of it in argument, which is that the rates to Mobile as they previously stood and as they were reduced and restored still exceeded those to the other water-transportation points which are mentioned, which is a clear misapprehension.

It is also said by the Commission in the same connection that these rates exceed those from Nashville, Memphis, Cincinnati, and Louisville to points approximating the same distance. There is no way of knowing on what this is predicated, there being no reference to any schedules or tables of comparison by which to verify it. Neither is there anything in the evidence before the Commission which apparently warrants it. And by contrast, in the evidence taken under the bill which is now before us, it is proved without contradiction that in a large number of instances the fact with regard to the rates from the places named is just the opposite.

Another ground taken by the Commission to justify its action is that the rates between New Orleans, Mobile, and Pensacola, until the advance made by the railroad, were identical in both directions, westward as well as eastward, a condition which prevailed, as it is said, between other cities, such as New Orleans, Memphis, Greenville, Vicksburg, and Natchez, and that the raising of rates in the one direction resulted in a disturbance of relations between points where geographic and commercial conditions called for equality.

[5] But it has often been recognized by the Commission that the mere fact that a rate is higher one way between the same points than it is the other does not prove that the higher rate is unreasonable. Duncan v. Atch., Topeka & Santa Fé, 6 Interst. Com. Comm. R. 85, 103; McLoon v. Boston & Maine R. R., 9 Interst. Com. Comm. R. 642; Weil v. Pa. R. R., 11 Interst. Com. Comm. R. 627. And this is particularly true where there is a preponderance of empty cars moving in the one direction, of which there is here some suggestion. There is also some evidence that the rates westward from Mobile to New Orleans are lower than they should be, all of which goes to show that there is practically nothing to be made out of this contention.

It is further said by the Commission that the advances made from

New Orleans to Mobile in the enumerated classes were severely felt by certain shippers in the former city, especially those engaged in jobbing canned goods, lard, flour, coffee, oil, crackers, pickles, vinegar, beans, etc.; that New Orleans is an important distributing market for canned beans, some 400 to 500 car loads being handled there; and that the increase on this commodity was particularly burdensome, if not practically prohibitory of shipping into New Orleans and out to Mobile. [6] That the advances made in the rates on these classes of goods would be severely felt by certain shippers is not a sufficient reason for holding that they were not what they ought to be. Such an advance would, of course, be felt, and so would any other change in market conditions which affected the cost of handling. With regard to the other statements made by the Commission in this connection, it is undoubtedly true that New Orleans and Mobile are both jobbing points; but, so far as concerns beans, they get their supply from practically the same markets and at the same freight rates. In this respect they are rivals; and it is altogether out of line to expect that the rates on beans from New Orleans to Mobile should be so reduced that the jobbers in New Orleans can compete with those in Mobile, and thus invade the latter's own home market. A counter protest from the jobbers in Mobile, if this were done, would be in order as a matter of self-protection, and would have to be listened to. The same is true with respect to the other commodities named; as it is also with regard to paper, stovepipe, tinware, tubs, and galvanized iron tubs, as to which, according to the Commission, the advance in rates made by the railroads would have to be absorbed by the manufacturers.

The evidence with regard to all this is not in conflict. Take, for example, the testimony of George P. Thompson, president of the New Orleans Grocers' Association, which has already been referred to in connection with the rate to Montgomery. He has been selling canned goods, crackers, and baking powder at Mobile for a number of years, as he says, and the advance in rates, according to his statement, has affected him materially. There has also been a serious falling off in peas and beans, particularly the black-eyed beans which are dried in bags, the best coming from California. Mobile, as he says, is a large consumer of these for export and otherwise, and, if New Orleans is shut out from there, it means a control of the bean business by the railroad. But he admits that Mobile can buy beans from California as cheaply as he can, and that the rate from there to each of these two cities is the same. And he, therefore, when you come to analyze it, simply wants the local rate from New Orleans to Mobile kept down to a point where he can have a chance to compete at Mobile or places basing on there with the Mobile jobber on the same product. So also with regard to canned goods, baking powder, candles, etc., the rates on which from Memphis to Mobile are shown to be less than from New Orleans. The comparison so made is of no particular significance without a consideration of how the rates from Memphis happen to be what they are (whether these rates are class or commodity), and why that city enjoys this apparent advantage. Mr. Thompson also speaks of New Orleans as a great distributing port for olive oil and coffee, and thinks that recognition should be given it on outbound

rates acordingly; but except that Mobile buys oil from New Orleans he makes no application of this statement.

W. O. Hudson, manager of the Marine Oil Company, says he is forced into competition at Mobile with oil from the Ohio oil field, from whence also he gets his supply from the National Refining Company, which has refineries at Cleveland, Marietta, and Findlay. He stocks up for Mobile from there, but it would suit him better to do so from New Orleans, which would relieve him from the necessity of carrying so many men, and where his facilities are greater. These purely personal considerations have no bearing, of course, on the reasonableness of these rates, which are not to be fixed to accommodate any particular person's business.

There is but one witness, Mr. E. C. Palmer, who has anything to say about the paper industry. Testifying eight months after the advance in rates had gone into effect, while he feels that it may be injurious when his customers get onto the idea, he admits that so far it has not been so. His concern also is only as to goods going through Mobile to points beyond and not as to Mobile proper, although he does business there. New Orleans, as he says, is the principal distributing point in the South for newspaper material, competing with St. Louis, Cincinnati, and Nashville, but having an advantage in rates, as a rule, from western points of manufacture; the rates to New Orleans and to Mobile being equal. There would seem to be nothing calling for relief in this situation.

So, also, with reference to stovepipe, tinware, tubs, and galvanized tubs, Mr. McBride, of the National Enameling Company, says that the manufacturers have not been compelled to absorb the advance, as stated by the Commission, although he thinks it probable in the end that they may have to do so. Prices have been increased to the extent of the advance, but no one in Mobile has declined to buy on account of it. It simply has increased the cost to the jobber, and he, in turn, sells higher to the retailer. He admits that the New Orleans manufacturers still have a lower rate to Mobile than any other point with which they come in contact; but the difference is slight, and it would take but a small advance to equalize it. The trade at Mobile has been accustomed to buy goods delivered, and it is going to be difficult, as he says, to get the increase from them in the future, although the New Orleans manufacturer is now doing so. Under normal conditions, the manufacturers would have to absorb the advance and keep the Mobile jobber on a par with others, but now it is done by the jobber.

There is nothing in any of this to sustain the findings of the Commission which have been referred to, or to justify the reduction which it has ordered. The rates to Mobile were so low before, that the manufacturers in New Orleans could afford to absorb them and did so. They cannot perhaps afford to do so now. And, because the Mobile jobber has become accustomed to get his goods free, the manufacturers in New Orleans anticipate trouble. But this is a possibility which the railroad cannot be required to prevent; and the situation as disclosed by this witness indicates that the former rate was certainly low.

195 F.—36

Again, the Commission makes the statement that the advance in rates on furniture, iron beds, etc., had practically closed out the business with Mobile in these articles, better rates being made on them from other manufacturing points, such as Atlanta, Ga., and High Point and Winston-Salem, N. C. This is a clear mistake of fact, due, no doubt, to inadvertence, but none the less serious, it being the uncontradicted evidence that, with one single exception, where the rate from Atlanta to Mobile is a cent lower than from New Orleans, all the rates on all the articles named from the three places mentioned are not only higher, but very materially higher, than from New Orleans. It is true that, according to Mr. Wright, there is a restrictive loading rule with regard to furniture from New Orleans to Mobile which is not imposed as to Nashville and Memphis. But this does not apply to any other points, and, while it apparently gives some advantage to Memphis over New Orleans, Nashville is simply put on an equality with it. It is to this rule, also, and to the changed classification of mixed furniture in car loads, that he ascribes his loss of trade, rather than to the present rate advances.

The testimony of P. Jung, another iron bed manufacturer, is even less to the purpose. He says he never sought the Mobile field nor made any effort to get into Pensacola, and has not been affected by the advance in rates to these places. Before the advance he solicited business throughout Alabama and Georgia, but found that he would have to guarantee rates as against Atlanta, High Point, and Winston-Salem, and that the trade did not warrant it. Evidently the increase did not harm nor would the reduction help him.

This is all the evidence there is as to furniture and iron beds, and it is clear that it does not in any particular support the statement of the Commission.

It is further said, however, by the Commission that the advance in rates on bags, burlap, gunny, and jute was vigorously opposed, and a strong protest also made on account of the alleged discrimination against New Orleans in cotton goods; it being asserted that other manufacturing points were given more favorable rates. This is sought to be sustained as to cotton goods by a comparison of rates from Virginia and North and South Carolina points, as well as from Augusta, Ga., and even from New York and Boston. The suggestion that the advance was vigorously opposed or that a strong protest was made affords neither evidence nor argument. This is always to be looked for where there is an increase in prices, whether warranted or unwarranted. Nor is anything more to be made out of the rate comparison. The Commission does not say that the rates to Mobile on cotton goods are less from other manufacturing points than from New Orleans, which is not the fact, as is demonstrated by the evidence, but only that the rates are more favorable. But this is based on the mere matter of distance, which is no criterion, as already stated, without the consideration of other attending conditions. As pointed out also in connection with the Montgomery rates—according to the testimony of Mr. Odenheimer, on which this part of the case is evidently based—there are cotton mills both at Mobile and Montgomery, as well as at the other competing points named, and it is not to be expected that

rates on cotton goods should be put so low that New Orleans manufacturers would have an advantage over all others in that territory beyond what they already have, which would be the rankest discrimination. And the matter of burlap and gunny bags is not much different. The testimony of Mr. R. J. Wood is directed to this, and has already been considered in another connection. So far as Montgomery and Pensacola are concerned, he frankly says that the advances have not injured his business. His complaint is as to points beyond, with regard to which he has not a little to say, but it has been discussed above, and there is no occasion to again go over it.

This completes the case as to Mobile; and that with regard to Pensacola, except that it is still weaker, is no different. It is said by the Commission that the advance in rates "was not so heavy or so injurious to the merchants in New Orleans in their trade with Pensacola as the advance to Mobile, but they strongly protested against it, and it was shown that, proportionately, like conditions resulted from the advance as were produced by the increase in rates to Mobile." But there is nothing to sustain this statement. One witness, Mr. Palmer, a paper dealer, says that he would be affected in Pensacola the same as Mobile; but he is not affected at all at Mobile, and cannot, therefore, be at Pensacola. Another, Mr. Steinhart, who deals in soap, says that they get no orders from Pensacola because the rate is said to be so high; and what he wants and thinks the company should come down to, as he is not slow in saying, is a 10 or 12 cent rate, the same as on rice and sugar, which is hardly to be expected. The other witnesses called, to a man, declare either that they have no complaint to make or that their business at Pensacola is slight or that they have not been affected; and yet the Commission finds with regard to the trade with Pensacola what has just been stated.

Opposed to the evidence which has been thus referred to—if there can be said to be any opposition to what is so irrelevant and wanting in persuasiveness on the question as to what is reasonable—there are several witnesses produced by the railroad company of large experience, who testify that the rates prescribed by the Commission, both to Mobile and Pensacola, as well as to Montgomery, are unjust and unfair, under all the circumstances, and among others; because they are less than those usually and ordinarily charged by the company, as well as by other railroads for the transportation of like classes of property between other points in the South separated by similar distances; because the rates which were cut down permitted a free movement of traffic and there were no competitive or commercial conditions calling for a reduction; and because the rates as reduced would give to New Orleans an undue and unreasonable advantage and preference over Vicksburg, Memphis, and other Mississippi and Ohio crossings, and would disrupt and destroy the relative adjustment and the general system of rates which have prevailed in the southeastern territory ever since the Cooley Arbitration. It is also indisputably shown that the New Orleans-Mobile line along the Gulf coast is exceptionally difficult and costly to operate; that a considerable portion of it consists of long

trestles and bridges which are subject to extraordinary damage and sometimes to a complete destruction by floods and freshets in the streams which they span; that its proximity to the Gulf lays it open to the full force of the Gulf storms and hurricanes, by which it was entirely put out of business for nearly a month in the early fall of 1909, and for considerable periods at different times previously; that the intermediate territory traversed is so sparsely settled and its freight traffic so small that the successful and profitable operation of the line is necessarily dependent on the through traffic between New Orleans and Mobile and points beyond, in consequence of which the company has never received even a fair return from its operations; and, finally, that the cost of operation by reason of the increase in wages, in maintenance, and in the price of locomotives, cars, and other matters of equipment, has grown so enormously in the last few years that to go back to rates established under earlier conditions, when there was active water competition, instead of being fair and reasonable, is to work great and manifest injustice in disregard and in the face of this undisputed showing.

[7] There was no attempt to meet the case as so made out for the company either by way of argument or otherwise. Counsel for the Commission and for the government simply rely on the authority of the Commission to determine what is a reasonable rate and the conclusiveness of its judgment where it has done so, against which, it was argued, the courts can afford no relief unless the rate which has been fixed is shown to be confiscatory. But this contention, as presented and sought to be applied in the case at bar, must be rejected. In our judgment it was never intended to confer on the Commission any such unrestrained and undirected power. As already pointed out, the law provides for a hearing, and it must be more than a shadow. Both parties are entitled to be confronted with the evidence on which the case is to be determined, and the conclusion reached must be a reasonable inference from the facts disclosed by the investigation. This construction of the Commission's authority and the conditions which limit its exercise appear to us clearly and definitely settled by the recent decision in Interstate Com. Com. v. Union Pacific R. R., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. ——, supra, which is the latest and fullest utterance of the Supreme Court in a case of the same general class as the one now under consideration.

[8] Tested by the principles laid down in that decision, we are of opinion that the order here drawn in question must be held invalid as exceeding the delegated powers of the Commission, because there was no substantial evidence to sustain it. It is not merely that the evidence preponderates in favor of the reasonableness of the rates which have been cut down. Concededly, that would not be enough to challenge the action of the Commission. Not only is the Commission vested with a discretion which cannot be disturbed, and which we intend unqualifiedly to respect, but it is entitled to select the testimony which it will believe and rely upon, according as it addresses itself to the discriminating judgment of the Commission. But it is not within the

authority of the Commission to reduce the rates in this or any other case not merely against the weight of the evidence produced to sustain them, but without anything substantial to warrant the conclusion reached or the reasons assigned therefor. And this we are convinced is a case of that character. The only discoverable basis for condemning the rates to Mobile and Pensacola is the fact that they had been advanced in 1907, and this of itself was clearly not sufficient. Interstate Com. Com. v. Chicago Great Western, 209 U. S. 108, 28 Sup. Ct. 493, 52 L. Ed. 705. If the long continuance of lower rates to these points or the circumstances connected with their increase called for explanation, as suggested in the case cited, the explanation made by the carrier, in the absence of anything to discredit it, must be held to sustain the advance as against any presumption that it was unreasonable, and therefore there was nothing substantial to support its condemnation. Nor is there anything of substance to sustain the reduction of the Montgomery rates except the fact that they exceeded the former combination on Mobile and Pensacola. Outside of these facts, having regard to the undisputed evidence adduced at the hearing, the existing rates were not shown to be unjust or unreasonable and there was therefore no valid basis for the Commission's conclusion.

And the petitioner is therefore entitled to a decree annulling the order.

MACK, Judge (dissenting). The salient facts briefly stated are that prior to August, 1907, the through rates on certain classes from New Orleans to Montgomery exceeded the combination of rates in force from New Orleans to Mobile and Pensacola, respectively, and from these places to Montgomery. All of the rates had been in force for many years. No change has been made in the rates on that part of the road between Mobile and Pensacola, respectively, and Montgomery, but in August, 1907, the rates from New Orleans to Mobile and to Pensacola were advanced exactly enough to make the combination on these points equal to the through rate from New Orleans to Montgomery. While the railroad attempts to justify this advance by the assertion that the former rate was unreasonably low, having been put into effect many years before in order to cut out water competition, nevertheless it is admitted that the immediate cause of the advance was the announcement by the Commission of the rule that a through rate must not exceed the combination of the locals. To comply with the rule, it was necessary either to reduce the through rate from New Orleans to Montgomery to the sum of the locals or to raise one or both of the latter. The railroad chose the latter alternative. The Commission, by its order, endeavored to compel it to adopt the former.

The Commission could do this only if it found that the new rates from New Orleans to Mobile and Pensacola, respectively, and the unchanged rate from New Orleans to Montgomery were unreasonably high. If, on a review of the record before the Commission, this court finds that there was no substantial evidence on which to base such a conclusion, it would be our duty to annul the order, inasmuch as the power of the Commission to reduce rates to a reasonable figure is con-

ditioned on the opinion of the Commission, formed after a full hearing, that the tariff rate is unreasonably high, not its arbitrary and uncontrolled opinion, but its deliberate judgment based on substantial evidence produced at the hearing prescribed by the act.

While this principle is that adopted in the opinion of the court, I differ with my Brethren in the application of it to the facts of this case. Whatever view I might have taken as to the reasonableness of the tariff rates had I been a member of the Commission, I cannot find that there is no substantial evidence to support the conclusions reached by it that they are unreasonably high.

Let us first consider the raised rates from New Orleans to Mobile and Pensacola. While, as the majority of the court state, there is no presumption that they are unreasonable merely because the old rates have been raised, yet there is likewise no presumption that they are reasonable merely because the carriers have put them into effect. When a rate is attacked immediately after it is made, there is no presumption either for or against its reasonableness. If it has been in force for some time and traffic has moved freely under it, a presumption does arise that it is reasonable. That presumption would be sufficient to make out a prima facie case in favor of the reasonableness of the rate to which it applied and therefore to shift the burden of going forward with some evidence that it is unreasonable.

Apply these fundamental principles to this case. There is no presumption one way or the other as to the new rates. The ultimate burden of proof, at the time of this hearing and until the amendment of 1910, was on the shippers to show their unreasonableness. The absence of any presumption that they are reasonable was demonstrated when it was shown that they were put into effect just prior to this complaint; and a prima facie case that the old rates are reasonable and the raised rates therefore unreasonable was made out when it was proved that the former had been in force for many years.

The burden of going forward with evidence that will meet this prima facie case, or, in other words, the obligation to give some valid explanation of the increase, now devolves on the carrier. This may be satisfied by showing that the old rates were compelled by water competition, and that they are unreasonably low by at least the amount of the increase. But if the shippers prove that these water competitive rates had continued for many years after actual water competition in any real sense had ceased, and under conditions clearly negativing any danger of a recurrence thereof, the presumption of their inherent reasonableness again arises, and may, in the discretion of the Commission, be deemed sufficient proof thereof.

The testimony before the Commission tended strongly to show that no renewal of water competition was feasible after it had once ceased to be a factor in the transportation situation, because of labor conditions, wharf control by the railroads, and the justifiable fear that an investment in steamers by the shippers or others would be rendered worthless, inasmuch as the railroads would cut their rates to any extent necessary to secure the business. It must be remembered in this

connection that at that time and until the amendment of 1910 railroads could cut their rates without restraint in order to destroy competition, and after accomplishing that purpose raise them again without the consent of the Commission.

On these considerations alone, and disregarding any other evidence the action of the Commission in finding the new rates unreasonably high to the extent of the increase over the old rates from New Orleans to Mobile and Pensacola, respectively, ought, in my judgment, to be sustained as against the charge of arbitrary or unjustified action.

We come next to the consideration of the New Orleans-Montgomery rate. A presumption of its reasonableness arises from the fact that it had been long in force. To overcome this presumption, the shippers showed, first, that it was customary both on this and other roads not to charge more for the through rate than the combination of locals, although admittedly this custom had not been enforced for this particular through traffic; secondly, that the Commission had now adopted a rule in accordance with the custom.

Whatever the concession of the counsel for the government may mean—and in my opinion it does not go so far as the majority of the court believe—the fact alone that the through rate exceeds the combination of locals is in my judgment an all-sufficient reason for a reduction to the extent of the excess. There may be peculiar and extraordinary circumstances which will cause the Commission to refrain from compelling such a reduction, but ordinarily, and in the present case the increased cost to the carrier of handling two local shipments and the economic waste involved therein as against a single through shipment, if the shipper should exercise his legal right of shipping from New Orleans to Mobile, and then from Mobile to Montgomery on the local rates, amply justified the Commission in promulgating its rule and in enforcing it by the reduction of the New Orleans-Montgomery through rate. Congress, moreover, has now, by the amendment of 1910 to section 4 of the act to regulate commerce, given this rule the force of law.

That the reduction ordered by the Commission in the New Orleans-Montgomery rate was exactly enough to make the through rate equal the combination of locals as reduced is no more peculiar than that the increase by the carrier in the local New Orleans-Mobile and New Orleans-Pensacola rates was exactly enough to make the combination of locals as increased equal the former through rate. And when the principal witness of the carrier testifies (p. 323 of the testimony before the Commission) that in his judgment the raised rates "from New Orleans to Mobile are not too low, and I do not think they are too high," in other words, that they are exactly right, and he so testifies notwithstanding his frank admission that the cause of the raise was to check the application of the new rule to the old rates, the Commission cannot, in my judgment, be said to have acted arbitrarily in not accepting this view of the result effectuated by the raise.

While I differ with my Brethren in their criticism of a number of statements made in the report of the Commission, it is unnecessary to discuss them here. For example, the view taken by the Commis-

sion of the Cooley adjustment is fully justified, in my judgment, by the fact that the relation of rates thereby established in 1886, was departed from not as to some, but as to a great many commodity rates and that, too, at many times. Even as to class rates, there were departures not only in 1896, but also in 1905.

Even though some errors of fact may be found in the report, these are clearly not the real basis of the order. Moreover, if any inequalities or undue preferences as against other localities result from the order of the Commission, they may be remedied on proper complaint, by the proper parties, to the Commission. The majority opinion is confined to a single question, and I have for that reason limited this dissent to a consideration of it. Without, therefore, discussing the many interesting questions of confiscation and jurisdiction presented in the briefs and oral arguments, it suffices at this time to state that in my opinion the other grounds urged against the order of the Commission are equally unavailing and that the petition should be dismissed.